JUDGE SAND



08 CV 7605

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LOUISIANA MUNICIPAL POLICE EMPLOYEES RETIREMENT SYSTEM, Derivatively and on Behalf of GOLDMAN SACHS GROUP, INC., <br><br> Plaintiff, <br><br> vs. <br><br> LLOYD C. BLANKFEIN, JON WINKELREID, GARY D. COHN, JOHN H. BRYAN, CLAES DAHLBACK, STEPHEN FRIEDMAN, WILLIAM W. GEORGE, RAJAT K. GUPTA, JAMES A. JOHNSON, LOIS D. JULIBER, EDWARD M. LIDDY, RUTH J. SIMMONS, LAKSHMI N. MITTAL, DAVID A. VINIAR, and ALAN M. COHEN, <br><br> Defendants, <br><br> and <br><br> GOLDMAN SACHS GROUP, INC., <br><br> Nominal Defendant. | RECEIVED AUG 28 2008 U.S.D.C. S.D.N.Y. CASHIERS <br><br> Case No. _____ <br><br> VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, ABUSE OF CONTROL, GROSS MISMANAGEMENT, AND VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934 <br><br> **Jury Trial Demanded** |

Plaintiff, by its undersigned attorneys, submits this Shareholder Derivative Complaint ("Complaint") against each of the individual defendants ("Defendants") named herein and, nominally, against Goldman Sachs Group, Inc. ("Goldman Sachs" or the "Company").

## NATURE OF THE ACTION

1.      Goldman Sachs is one of the leading providers of financial services in the world, with a substantial and diversified client base that includes corporations, financial institutions, governments and high-net-worth individuals.  As such, the Company depends for its success on the identity of its brand – and its reputation for honesty and integrity.

2.      Today – through the misconduct of certain officers and directors named as defendants herein – Goldman Sachs's reputation lies in tatters.  Defendants consciously steered the Company down a path of deceit and manipulation in the market for so-called auction rate securities ("ARS") that will take years to recover from and cost Goldman Sachs *billions of dollars* in settlements, fines, and lost business.  The Company has been the target of an administrative proceeding by the Securities and Exchange Commission ("SEC") relating to ARS.  The New York Office of Attorney General and other state securities agencies have commenced their own investigations.  In response, Defendants recently agreed to a settlement requiring the Company to pay a fine of **$22,500,000**, and repurchase **$1,500,000,000** worth of ARS from customers.

3.      Plaintiff Louisiana Municipal Police Employees Retirement System (the "Retirement System" or "Plaintiff") is a large institutional shareholder of Goldman Sachs.  The Retirement System brings this action on behalf of the Company against the directors and officers who are responsible for the ARS debacle.  The action is based on defendants' wrongful conduct during the period from June 20, 2007 to the present (the "Relevant Period").

### Auction Rate Securities

4.      The action concerns auction rate securities marketed by Goldman Sachs to its customers during the Relevant Period.  ARS are municipal bonds, corporate bonds, and preferred

stocks with no fixed rates of return, but whose rates of return are periodically re-set – typically every 7, 14, 28, or 35 days, but in some cases even daily – by an auction process. ARS are usually issued with maturities of 30 years, but the maturities can range from five years to perpetuity. First developed in 1984, as of today's date, the market for ARS has grown to well over $300 billion annually.

5.      ARS represented a large and lucrative portion of Goldman Sachs's fixed income division, and the Company's overall profits depended substantially on its ability to sell such securities to its corporate, institutional, and retail customers.

6.      The success of the ARS market at Goldman Sachs – on which Defendants' reputation and bonuses were based – depended on the perception that the market was extremely liquid. This is because the primary target customers for ARS are investors with short-term investment goals or cash-equivalent needs. Any hint that the ARS market was not liquid had the potential to trigger a massive sell-off by investors flocking to safer, more stable securities. Thus, a failed auction, or even the rumor of one, was something that Defendants sought to avoid at all cost, even if it meant steering the Company into an illegal course of action.

### Defendants' Illegal Course of Conduct

7.      That is precisely what Defendants did. Although the market for ARS had become illiquid by mid-2007, Defendants – to protect the profits Goldman Sachs made on ARS and to enhance their own positions and compensation – conspired to create the illusion that the market remained liquid. Thus, Defendants engaged in various practices designed to "support" the market, which they termed market "stabilization." In reality, however, the conduct was nothing short of the type of market manipulation scheme that the securities laws have, for generations, prohibited.

8.     For example, Defendants caused Goldman Sachs to: (a) take over its own customers' bid orders by filling in the blanks on open or market orders *after viewing other bidders' orders*; (b) bid for its own accounts without disclosing this fact to customers; (c) engage in a process of "netting" of customers' buy and sell orders so as to favor certain customers at the expense of others; (d) allow for rampant submission or revision of bids *after* the expiration of deadlines set by the ARS market; (e) collaborate with certain customers by asking them to bid at auctions and then compensating them in the secondary market with rates that were higher than the official clearing rate set at auction; and (f) give inconsistent and contradictory indications to customers regarding the likely range at which particular auctions would clear.

9.     Despite Defendants' attempt to artificially prop up the ARS market at Goldman Sachs, the inherent illiquidity in the market soon overwhelmed Defendants' efforts. By August 2007, more auctions were failing than succeeding. Beginning at that point, Defendants decided to sell as many of the Company's ARS as they could to unsuspecting customers – and thereafter to simply "walk away" from the ARS market.

10.     By February 2008, Defendants' goal was accomplished. Thousands of investors, holding millions of dollars of ARS purchased from Goldman Sachs, were now left with highly illiquid, and essentially worthless, investments.

11.     Defendants' efforts to conceal their market manipulation scheme were to no avail. The Company soon became the target of investigations by the SEC, New York Attorney General, and other state agencies.

12.     Goldman Sachs settled many of the investigations almost immediately, agreeing to an onerous settlement with the Attorney General that, among other things, required the Company to pay a fine of **$22,500,000**, and to repurchase **$1,500,000,000** of ARS from customers.

13.     Defendants' actions have caused significant and lasting harm to Goldman Sachs. The Company is exposed to billions of dollars in losses, settlements, damages, and other liability that it would not otherwise have been exposed to. In addition, the Company faces irremediable damage to its reputation from formal investigations, and possibly criminal indictments, by various state and federal agencies. The SEC, for example, stresses that its investigation is "ongoing."

14.     Defendants' acts and omissions constituted material breaches of their fiduciary duties to Goldman Sachs. Throughout the Relevant Period, Defendants breached their fiduciary duties to shareholders and the Company, in the following ways, among others:

(a)     Deceptively marketing ARS to customers as highly liquid cash alternatives when, in fact, the ARS market was anything but liquid;

(b)     Failing to disclose that the ARS market was only "liquid" to the extent that Defendants and other broker-dealers had created an artificial market for ARS;

(c)     Failing to disclose that they caused Goldman Sachs to purchase ARS for its own account to avert auction failures and that, but for these and other interventions, a great deal of these auctions would have failed;

(d)     Manipulating the market for ARS by various methods and thereby exposing the Company to criminal and civil investigations and liability, as well as the obligation to repurchase ARS and maintain large inventories of ARS that are essentially worthless;

(e)     Failing to implement or maintain adequate internal controls to ensure that the Company's transactions in ARS were legal, honest, and fair to customers;

(f)     Making false and misleading statements to the Company's shareholders regarding the supposed liquidity of the ARS market, the integrity of the profits made by the Company from this market, and the Company's exposure to losses from ARS;

(g)     Paying themselves lavish salaries, bonuses, stock awards, and other compensation at a time when they had caused Goldman Sachs to face exposure in the tens of billions of dollars for their wrongdoing; and

(h)     Unjustly enriching themselves at the expense of the Company through their sale of stock based on material, non-public information.

15.     To remedy this wrongdoing, the Retirement System seeks relief in the name of the Company that, among other things, requires Defendants to pay damages to the Company to compensate it for its losses at their behest, requires Defendants to make restitution to the Company of the monies they caused it to transfer to them, and requires the Company itself to institute appropriate reforms to strengthen the Board's supervision of operations and strengthen the internal audit and control functions.

## JURISDICTION AND VENUE

16.     This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331, because of claims presenting federal questions arising under the Securities Exchange Act of 1934, and pursuant to 28 U.S.C. § 1367(a) because all other claims are so related to claims presenting federal questions that they form part of the same case or controversy. This Court also has jurisdiction over all claims asserted herein pursuant to 28 U.S.C. § 1332 in that, upon information

and belief, complete diversity exists between the Retirement System and each of the Defendants and the amount in controversy exceeds $75,000.

17.     The Court has personal jurisdiction over each of the Defendants because each either is a corporation that conducts business in and maintains operations in this District or is an individual with sufficient minimum contacts with this District as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

18.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because:  (a) Goldman Sachs maintains its principal place of business here; (b) one or more of the Defendants either resides in or maintains executive offices here; (c) a substantial portion of the transactions and wrongs complained of herein occurred here; and (d) Defendants have received substantial compensation and other transfers of money here by doing business here and engaging in activities having an effect here.

## THE PARTIES

### Plaintiff

19.     Plaintiff Retirement System is, and was during the Relevant Period, an owner and holder of the common stock of Goldman Sachs. The Retirement System is an instrumentality of the State of Louisiana and a resident thereof.

### Nominal Defendant

20.     Nominal defendant Goldman Sachs is a leading global investment banking, securities and investment management firm that provides a wide range of services worldwide to a substantial and diversified client base that includes corporations, financial institutions, governments and high-net-worth individuals. The Company is a corporation organized and existing under the laws of the

State of Delaware, with its principal place of business at 85 Broad Street, New York City, New York.

**Individual Defendants**

21.     Defendant Lloyd C. Blankfein ("Blankfein") has been the Chairman of the Board of Directors (the "Board"), as well as the Chief Executive Officer, of Goldman Sachs since June 2006, and a member of the Board since April 2003.  In exchange for his purported trust, loyalty, and fidelity to Goldman Sachs, Blankfein was paid $70,324,352 in salaries, bonuses, fees, stock options, stock awards and other compensation in 2007.  Since June 20, 2007, based upon his knowledge of material, non-public information about the Company, Blankfein sold nearly 66,000 shares of Goldman Sachs stock for $12.8 million.   Upon information and belief, Blankfein is a resident of New York.

22.     Defendant Jon Winkelried ("Winkelried") is the President and Co-Chief Operating Officer of Goldman Sachs.  He has been a member of the Board since June 2006.  In exchange for his purported trust, loyalty, and fidelity to Goldman Sachs, Winkelried was paid $71,455,426 in salaries, bonuses, fees, stock options, stock awards and other compensation in 2007.  Since June 20, 2007, based upon his knowledge of material, non-public information about the Company, Winkelried sold 161,524 shares of Goldman Sachs stock for $30.3 million.   Upon information and belief, Winkelried is a resident of New Jersey.

23.     Defendant Gary D. Cohn ("Cohn") is the President and Co-Chief Operating Officer of Goldman Sachs.  He has been a member of the Board since June 2006.  In exchange for his purported trust, loyalty, and fidelity to Goldman Sachs, Cohn was paid $72,511,357 in salaries, bonuses, fees, stock options, stock awards and other compensation in 2007.  Since June 20, 2007,

based upon his knowledge of material, non-public information about the Company, Cohn sold 79,883 shares of Goldman Sachs stock for $15.6 million.   Upon information and belief, Cohn is a resident of New York.

24.      Defendant John H. Bryan ("Bryan") has been a member of the Board since 1999. He is a member of the Audit Committee and the Compensation Committee, and Chair of the Corporate Governance and Nominating Committee, of the Board. In exchange for his purported trust, loyalty, and fidelity to Goldman Sachs, Bryan was paid $695,569 in fees, stock options, stock awards and other compensation in 2007. Upon information and belief, Bryan is a resident of New York.

25.      Defendant Claes Dahlback ("Dahlback") has been a member of the Board since 2003. He is a member of the Audit Committee, the Compensation Committee, and the Corporate Governance and Nominating Committee of the Board. In exchange for his purported trust, loyalty, and fidelity to Goldman Sachs, Dahlback was paid $662,091 in fees, stock options, stock awards and other compensation in 2007. Upon information and belief, Dahlback is a resident of New York.

26.      Defendant Stephen Friedman ("Friedman") has been a member of the Board since 2005. He is a member of the Audit Committee, the Compensation Committee, and the Corporate Governance and Nominating Committee of the Board. In exchange for his purported trust, loyalty, and fidelity to Goldman Sachs, Friedman was paid $662,091 in fees, stock options, stock awards and other compensation in 2007. Upon information and belief, Friedman is a resident of New York.

27.      Defendant William W. George ("George") has been a member of the Board since 2002. He is a member of the Audit Committee, the Compensation Committee, and the Corporate Governance and Nominating Committee of the Board. George sits on the Boards of Exxon Mobil Corporation and Novartis AG. In exchange for his purported trust, loyalty, and fidelity to Goldman

Sachs, George was paid $662,091 in fees, stock options, stock awards and other compensation in 2007. Upon information and belief, George is a resident of Massachusetts.

28.    Defendant Rajat K. Gupta ("Gupta") has been a member of the Board since 2006. He is a member of the Audit Committee, the Compensation Committee, and the Corporate Governance and Nominating Committee of the Board. In exchange for his purported trust, loyalty, and fidelity to Goldman Sachs, Gupta was paid $662,091 in fees, stock options, stock awards and other compensation in 2007. Upon information and belief, Gupta is a resident of Connecticut.

29.    Defendant James A. Johnson ("Johnson") has been a member of the Board since 1999. Johnson sits on the Boards of Real Estate Group, Inc., KB Home, and Target Corporation. He is a member of the Audit Committee and the Corporate Governance and Nominating Committee, and Chair of the Compensation Committee. In exchange for his purported trust, loyalty, and fidelity to Goldman Sachs, Johnson was paid $695,569 in fees, stock options, stock awards and other compensation in 2007. Upon information and belief, Johnson is a resident of New York.

30.    Defendant Lois D. Juliber ("Juliber") has been a member of the Board since 2004. Juliber sits on the Boards of E. I. Du Pont de Nemours and Company and Kraft Foods Inc. She is a member of the Audit Committee, the Compensation Committee and the Corporate Governance and Nominating Committee. In exchange for her purported trust, loyalty, and fidelity to Goldman Sachs, Juliber was paid $670,091 in fees, stock options, stock awards and other compensation in 2007. Upon information and belief, Juliber is a resident of New York.

31.    Defendant Edward M. Liddy ("Liddy") has been a member of the Board since 2003. Liddy sits on the Boards of 3M Company and The Boeing Company. He is Chair of the Audit Committee, and a member of the Compensation Committee and the Corporate Governance and

Nominating Committee of the Board. In exchange for his purported trust, loyalty, and fidelity to Goldman Sachs, Liddy was paid $685,770 in fees, stock options, stock awards and other compensation in 2007. Upon information and belief, Liddy is a resident of Illinois.

32. Defendant Lakshmi N. Mittal ("Mittal") has been a member of the Board since June 2008. Mittal sits on the Boards of European Aeronautic Defense and Space Company EADS N.V. and ICICI Bank Limited. He is a member of the Audit Committee, the Compensation Committee, and the Corporate Governance and Nominating Committee of the Board. Upon information and belief, Mittal is a resident of New Jersey.

33. Defendant Ruth J. Simmons ("Simmons") has been a member of the Board since 2000. She is a member of the Compensation Committee and the Corporate Governance and Nominating Committee of the Board. In exchange for her purported trust, loyalty, and fidelity to Goldman Sachs, Simmons was paid $667,064 in fees, stock options, stock awards and other compensation in 2007. Upon information and belief, Simmons is a resident of Rhode Island.

34. Defendant David A. Viniar ("Viniar") has been the Executive Vice President and Chief Financial Officer of Goldman Sachs since 1999. In exchange for his purported trust, loyalty, and fidelity to Goldman Sachs, Viniar was paid $58,467,136 in salaries, bonuses, fees, stock options, stock awards and other compensation in 2007. Since June 20, 2007, based upon his knowledge of material, non-public information about the Company, Viniar sold 39,141 shares of Goldman Sachs stock for $7.7 million. Upon information and belief, Viniar is a resident of New Jersey.

35. Defendant Alan M. Cohen ("Cohen") has been the Executive Vice President and Global Head of Compliance of Goldman Sachs since 1994. In exchange for his purported trust, loyalty, and fidelity to Goldman Sachs, Cohen was paid millions of dollars in salaries, bonuses, fees,

stock options, stock awards and other compensation in 2007. Since June 20, 2007, based upon his knowledge of material, non-public information about the Company, Cohen sold 11,400 shares of Goldman Sachs stock for $2.2 million.  Upon information and belief, Cohen is a resident of New York.

36.     The Defendants who served on Goldman Sachs's Board during the events complained of named in paragraphs 21-33 hereof are referred to as the "Director Defendants." The Defendants who served as officers of the Company during the events complained of named in paragraphs 21-23 and 34-35 are referred to as the "Officer Defendants." (There is some overlap between these two groups of Defendants.)

## DERIVATIVE ALLEGATIONS

37.     Plaintiff brings this action derivatively in the right and for the benefit of Goldman Sachs to redress injuries suffered, and to be suffered, by Goldman Sachs as a direct result of the breaches of federal and state law, fiduciary duty, abuse of control, and gross mismanagement, as well as the aiding and abetting thereof, by the Defendants. Goldman Sachs is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

38.     Plaintiff will adequately and fairly represent the interests of Goldman Sachs in enforcing and prosecuting its rights.

39.     Plaintiff is and was an owner of the stock of Goldman Sachs during times relevant to the Defendants' wrongful course of conduct alleged herein, and remains a shareholder of the Company.

40.     Prosecution of this action, independent of the current Board of Directors, is in the best interests of the Company.

## DEMAND FUTILE AND EXCUSED

41.      Demand upon the Board of Goldman Sachs that they institute this action in the Company's name would be entirely futile, and is therefore excused.

42.      The Board of Goldman Sachs consists of thirteen (13) individuals. None of these individuals are disinterested and independent with respect to the acts and omissions alleged herein, and each faces a substantial likelihood of personal liability:

      (a)      **Blankfein, Winkelreid, and Cohn** are high-level, highly-compensated executive officers of Goldman Sachs, and the Company has conceded that they are not independent under either the listing standards of the New York Stock Exchange or the Company's own Director Independence Standards.

      (b)      **Liddy (Chair), Bryan, Dahlback, Friedman, George, Gupta, Johnson, Juliber, and Mittal** sit on the Audit Committee, which allowed Goldman Sachs to defraud its own customers, manipulate the market for ARS, carry the ARS on the Company's books at an artificially inflated price, and expose the Company to tens of billions of dollars in damages.

      (c)      **Mittal** is the Chairman and Chief Executive Officer of ArcelorMittal, the largest steel producer in the world, and a crucial client of Goldman Sachs; in the last decade, the Company has advised Mittal on transactions totaling $47 billion.

      (d)      There is an almost *100 percent overlap* among the three supposedly separate and independent committees of the Board. With a single exception, *each* of these committees -- Audit, Compensation, and Corporate Governance and Nominating -- is comprised of *exactly the same directors*: **Bryan, Dahlback, Friedman, George, Gupta,**

**Johnson, Juliber, Liddy, Mittal, and Simmons.**[1] These committees have no meaningful distinction from the full Board and exist simply to rubber-stamp the positions of the full Board, which is dominated by management.

(e)   **Dahlback** advises, and has a substantial economic interest in, certain funds Goldman Sachs affiliates have invested nearly $30 million in and paid over $1 million in management fees to. In 2007 alone, Dahlback, through his interests in the funds, received distributions aggregating $8.6 million upon the disposition of certain fund investments in transactions aggregating approximately **$4.5 billion** for which Goldman Sachs affiliates performed investment banking services.

(f)   A sibling of **Winkelreid** is employed by Goldman Sachs at an annual salary of $800,000.00.

(g)   During 2007, Goldman Sachs engaged in significant business transactions with various companies which **Bryan** or his immediate family members served as a director or officer, as well as with various tax-exempt organizations which Bryan or his immediate family members are employed by or affiliated with. The Company further made significant charitable contributions to Bryan's tax-exempt organizations.

(h)   Goldman Sachs engaged in significant business transactions in 2007 with various companies which **Dahlback** or his immediate family members served as a director or officer, and with various tax-exempt organizations which Dahlback or his immediate family members are employed by or affiliated with.

---

[1] The single exception is that defendant Simmons does not sit on the Audit Committee.

(i)     The Company in 2007 engaged in significant business transactions with various companies which **Friedman** or his immediate family members served as a director or officer, and with various tax-exempt organizations which Friedman or his immediate family members are employed by or affiliated with. The Company further made significant charitable contributions to Friedman's tax-exempt organizations.

(j)     Goldman Sachs, during 2007, engaged in significant business transactions with various companies which **George** or his immediate family members served as a director or officer, and with various tax-exempt organizations which George or his immediate family members are employed by or affiliated with. The Company further made significant charitable contributions to George's tax-exempt organizations.

(k)     Goldman Sachs engaged in significant business transactions with various companies which **Gupta** or his immediate family members served as a director or officer, and with various tax-exempt organizations which Gupta or his immediate family members are employed by or affiliated with, throughout 2007. The Company further made significant charitable contributions to Gupta's tax-exempt organizations.

(l)     The Company in 2007 engaged in significant business transactions with various companies which **Johnson** or his immediate family members served as a director or officer, and with various tax-exempt organizations which Johnson or his immediate family members are employed by or affiliated with. The Company further made significant charitable contributions to Johnson's tax-exempt organizations.

(m)     The Company during 2007 engaged in significant business transactions with various companies which **Liddy** or his immediate family members served as a director or

officer, and with various tax-exempt organizations which Liddy or his immediate family members are employed by or affiliated with. The Company further made significant charitable contributions to Liddy's tax-exempt organizations.

(n)     Goldman Sachs engaged in significant business transactions throughout 2007 with various companies which **Juliber** or her immediate family members served as a director or officer, and with various tax-exempt organizations which Juliber or her immediate family members are employed by or affiliated with. The Company further made significant charitable contributions to Juliber's tax-exempt organizations.

(o)     Throughout 2007, the Company engaged in significant business transactions with various companies which **Simmons** or her immediate family members served as a director or officer, and with various tax-exempt organizations which Simmons or her immediate family members are employed by or affiliated with. The Company further made significant charitable contributions to Simmons's tax-exempt organizations.

(p)     The **other directors** are dominated and controlled by Blankfein, Winkelreid, and Cohn. Winkelreid and Cohn were appointed by Blankfein and report directly to him. Blankfein has spent more than a quarter of a century at Goldman Sachs, running the Company's sales and trading operations, assisted by Cohn. His accession to a position of unquestioned power as Chairman and CEO confirms the Company's transition away from its traditional focus on investment banking and towards the trading of commodities, currencies, and derivative securities, including ARS, which now accounts for two thirds of the Company's revenues. The other directors will not question this triumvirate, particularly about the Company's sales and trading of ARS, given the Company's dependence on

trading, and given the triumvirate's control over the compensation and other benefits paid to the other directors, what committees they sit on, what role they will play in governance, and other processes.

(q)     **Blankfein, Winkelreid, and Cohn**, while in possession of material, non-public information regarding the Company's exposure to losses, settlements, and liability in the ARS market, sold **$58.7 million** in Goldman Sachs stock since June 20, 2007; these directors cannot be expected to objectively consider a demand that the Board take action against the Insider Selling Defendants (defined in paragraph 107) and the other Defendants.

(r)     **Dahlback** is the Chairman of EQT, one of the three largest buy-out firms in the Nordic region, which Goldman Sachs has advised on numerous deals, including the recent sale of Nycomed, a pharmaceutical firm, in which EQT received *nine times its original purchase price*.

43.     In addition, while Goldman Sachs and its public shareholders have suffered substantial damage and losses due to the deceit and deception committed by its insiders and the director oversight failings committed by its Board, the insiders and directors of this Company have not only suffered no damages but, in fact, have greatly profited from their participation in the illegal conduct. These individuals have usurped tens of millions of dollars of regular and bonus compensation, as well as severance payments, stock grants and stock awards as a result of their incompetent performance and deceptive activities.

44.     As a result of their concealments and falsifications, many of the directors and managers of Goldman Sachs held onto their positions of power, prestige and profit at the Company.

45.     The Goldman Sachs Board is still dominated and controlled by wrongdoers who continue to obscure their own misconduct, and will not take action to protect the interests of Goldman Sachs or its shareholders. The present Board of Directors of Goldman Sachs has refused, and will continue to refuse, to institute this action for the foregoing and following reasons:

(a)     The acts complained of herein constitute violations of fiduciary duties owed by the Board of Directors and these acts are incapable of ratification;

(b)     Certain of the known principal wrongdoers and beneficiaries of the wrongdoing complained of herein, including Blankfein, Bryan, and Cohn, are in a position to, and do, dominate and control the Board of Directors. Thus, the Board could not exercise independent objective judgment in deciding whether to bring or vigorously prosecute this action;

(c)     The acts complained of herein are illegal and improper and thus are acts incapable of ratification;

(d)     In order to bring this action for breach of fiduciary duty, abuse of control and fraud, the members of the Board of Directors would have been required to sue themselves and/or their fellow directors and allies in the top ranks of the Company, who are their good friends and with whom they have entangling financial alliances, interests, and dependencies, which they would not do. They therefore would not be able to vigorously prosecute any such action;

(e)     The members of the Goldman Sachs Board, including each of the defendants herein, receive substantial salaries, bonuses, payments, benefits, and other emoluments by virtue of their membership on the Board and their control of Goldman Sachs.

They have thus benefited from the wrongs herein alleged and have engaged therein to preserve their positions of control and the perquisites thereof, and are incapable of exercising independent objective judgment in deciding whether to bring this action.   The Board members also have close personal or business ties with each other and are, consequently, interested parties and cannot in good faith exercise independent business judgment to determine whether to bring this action against themselves; and

(f)     On information and belief, the Goldman Sachs directors' and officers' liability insurance policies for the relevant period have an "insured vs. insured" exclusion. Thus, if the directors caused the Company to sue its officers and directors for the liability asserted in this case they would not be insured for that liability. They will not do this to themselves or the officers they hired. The directors' and officers' liability insurance was purchased and paid for with corporate funds to protect the Company. This derivative suit does not trigger the "insured vs. insured" exclusion, and thus only this derivative suit can obtain a recovery on the directors' and officers' liability insurance and benefit the Company.

46.     In addition to the foregoing, the present Board of Directors of Goldman Sachs have refused, and will continue to refuse to institute this action because they face debilitating conflicts of interest as a result of their direct complicity in the actions complained of herein, the benefits that they received therefrom, and also as a result of their membership on committees of the Board directly responsible for oversight of the Company. In addition, demand on the Board of Directors of Goldman Sachs must also be excused for the following reasons, among others:

(a)     Defendant **Blankfein** will take no action against the remainder of the Goldman Sachs Board, and they will take no action against him, because he is the Chairman

of the Board and the Chief Executive Officer of the Company, has hand picked a majority of the Board, and has dominated and now continues to dominate and control the Company as a result of his joint roles as the senior most executive officer and leading Board member of the Company;

(b)     Defendants will also take no action against one another or against any member of the Board because each member of the Board received hundreds of thousands of dollars per year in compensation in exchange for their purported trust, loyalty and fidelity and as compensation for serving as a member of the Board and as member of the committees thereof.    Accordingly, defendants will take no action against themselves or the other members of the Board of Directors of Goldman Sachs, because doing so would place compensation in jeopardy at least as follows: over $70 million in salaries, bonuses, fees, stock awards and other compensation paid to defendant **Blankfein** in 2007; over $71 million in salaries, bonuses, fees, stock awards and other compensation paid to defendant **Winkelreid** in 2007; over $72 million in salaries, bonuses, fees, stock awards and other compensation paid to defendant **Cohn** in 2007;   $695,569 in fees, stock awards and other compensation paid to defendant **Bryan** during 2007; $662,091 in fees, stock awards and other compensation paid to defendant **Dahlback** during 2007; $662,091 in salaries, bonuses, fees, stock awards and other compensation paid to defendant **Friedman** during 2007; $662,091 in fees, stock awards and other compensation paid to defendant **George** during 2007; $662,091 in fees, stock awards and other compensation paid to defendant **Gupta** during 2007; over $695,569 in fees, stock awards and other compensation paid to defendant **Johnson** during 2007; $670,091 in fees, stock awards and other compensation paid to

defendant **Juliber** during 2007; and $685,770 in fees, stock awards and other compensation paid to defendant **Liddy** during 2007.

(c)     As members of the Audit Committee, defendants **Liddy (Chair),** **Bryan, Dahlback, Friedman, George, Gupta, Johnson, Juliber, and Mittal** will take no action against one another or the other members of the Board of Directors of the Company because each member of this Committee breached important specific duties outlined in the Audit Committee Charter and specified herein *infra*, by failing to prevent Goldman Sachs's manipulation of the market for ARS, its deception of its own customers, and its resulting exposure to government investigations, lawsuits, and the need to repurchase or otherwise carry tens of billions of dollars of essentially worthless ARS on its books, and by causing or allowing Goldman Sachs to make materially false statements about the Company, its controls, procedures, risk of loss, the value of its assets and its financial position and accounting;

(d)     As members of the Compensation Committee, defendants **Johnson (Chair), Bryan, Dahlback, Friedman, George, Gupta, Juliber, Liddy, Mittal, and Simmons** will take no action against one another or the other members of the Board of Directors of the Company because each member of this Committee breached important specific duties outlined in the Compensation Committee Charter and specified herein *infra*, by failing to prevent Goldman Sachs's manipulation of the market for ARS, its deception of its own customers, and its resulting exposure to government investigations, lawsuits, and the need to repurchase or otherwise carry tens of billions of dollars of essentially worthless ARS on its books, and by causing or allowing Goldman Sachs to make materially false statements

about the Company, its controls, procedures, risk of loss, the value of its assets and its financial position and accounting; and

(e)     As members of the Corporate Governance and Nominating Committee, defendants **Bryan (Chair), Dahlback, Friedman, George, Gupta, Johnson, Juliber, Liddy, Mittal, and Simmons** will take no action against one another or the other members of the Board of Directors of the Company because each member of this Committee breached important specific duties outlined in the Corporate Governance and Nominating Committee Charter and specified herein *infra*, by failing to prevent Goldman Sachs's manipulation of the market for ARS, its deception of its own customers, and its resulting exposure to government investigations, lawsuits, and the need to repurchase or otherwise carry tens of billions of dollars of essentially worthless ARS on its books, and by causing or allowing Goldman Sachs to make materially false statements about the Company, its controls, procedures, risk of loss, the value of its assets and its financial position and accounting.

47.     Plaintiff has not made any demand on any shareholders of Goldman Sachs to institute this action since such demand would be a futile and useless act for the following reasons:

(a)     Goldman Sachs is a publicly traded company with approximately 393 million shares outstanding that traded on the NYSE throughout the relevant period, which shares were held by thousands of shareholders located throughout the nation and abroad;

(b)     Making demand on such a number of shareholders would be impossible for plaintiff who has no way of finding out the names, addresses or telephone numbers of shareholders; and

(c)     Making demand on all shareholders would force plaintiff to incur huge

expenses, assuming all shareholders could be individually identified.

## FACTUAL BACKGROUND

48.     Goldman Sachs is divided into three fundamental businesses: Investment Banking;

Trading and Principal Investments ("TPI"); and Asset Management and Securities Services.   In

2007, revenues at TPI were $31.2 billion, *over twice the revenues of the other two divisions

combined.*  The ARS issued, sold, and marketed by Goldman Sachs were all transacted within the

Fixed Income, Currencies and Commodities ("FICC") division of the TPI.

### The ARS Market and the Existence of Control Deficiencies
### And Clear "Red Flags" About the Market's Safety and Liquidity

49.     ARS are securities which have no fixed rates of return, but whose rates of return are

periodically re-set – typically every 7, 14, 28, or 35 days, but in some cases even daily – by an

auction process.  ARS are usually issued with maturities of 30 years, but the maturities can range

from five years to perpetuity.

50.     First developed in 1984, as of today's date, the market for ARS has grown to well

over $300 billion annually.  Traditionally, the market was limited to institutional investors, but the

minimum investment in ARS recently was reduced to $25,000, placing these securities within the

reach of individual investors.

51.     ARS are auctioned at the "par" value – i.e., a specific dollar amount worth of

securities.  The pricing variable consists of the interest rate or dividend yield that the auction process

determines.  The rate or yield on any ARS is supposed to be set by a "Dutch" auction in which bids

with successively higher rates are accepted until all of the securities in a particular auction are sold.

52.     Investors typically can submit only the following types of orders:

      (a)    a "hold" order, which is the default order for current investors (i.e., the order that is entered for a current holder if the holder takes no action), where a current investor will keep the securities at the rate at which the auction clears;

      (b)    a "hold-at-rate" bid, where a current investor will only keep the securities if the clearing rate is at or above the specified rate;

      (c)    a "sell" order, where a current investor will sell the securities regardless of the clearing rate; or

      (d)    a "buy" bid, where a prospective investor (or current investor who desires additional securities) will buy securities if the clearing rate is at or above the specified rate.

53.    As stated by disclosure documents (such as prospectuses) issued with respect to each ARS, an investor's order is irrevocable. The final rate at which all of the securities are sold is the "clearing rate" that applies to all of the securities in the series until the next auction. Bids with the lowest rate and then successively higher bids are accepted until all of the sell orders are filled. The clearing rate is the lowest rate bid sufficient to cover all of the securities for sale in the auction.[2]

54.    If there are not enough bids to cover the securities for sale, then the auction fails, the issuer pays an above-market rate set by a pre-determined formula described in the disclosure

---

[2] Here is a simplified example of such an auction. Suppose $75,000 par value of securities were for sale and the auction received four buy bids. Bid 1 was for $25,000 at 3.05%. Bid 2 was for $25,000 at 3.10%. Bid 3 was for $35,000 at 3.10%. Bid 4 was for $20,000. In these circumstances, the "clearing rate" would be 3.10%, meaning all of the securities in the series would pay an interest rate (or yield, as the case may be) of 3.10% until the next auction. Bid 1 would be allocated $25,000. Bids 2 and 3 would receive pro-rata allocations of the remaining $50,000 worth of securities in proportion to the ratio of the par value bid for in each to the total par value bid for in both. Bid 4 would receive nothing.

documents, and all of the current holders continue to hold the securities, with some minor exceptions. If all of the current holders of the security elect to hold their positions without bidding a particular rate, then the clearing rate, referred to as the "all-hold" rate, is a below-market rate set by a different formula.

55.     The issuer of each ARS selects one or more broker-dealers to underwrite the offering and/or manage the auction process. Investors can only submit orders through the selected broker-dealers.   During the Relevant Period, Goldman Sachs was one of the largest broker-dealers participating in the ARS market.

56.     The issuer pays an annualized fee to each broker-dealer, such as Goldman Sachs, engaged to manage an auction. The fee is typically 25 basis points (i.e., 25% of 1%) for the par value of the securities managed by that broker-dealer.

57.     The issuer also selects an auction agent to collect the orders and determine the clearing rate for the auction. Investors must submit orders for an auction to the broker-dealer by a specified deadline. Many broker-dealers have an internal deadline by which investors must submit their orders to them.

58.     This internal deadline allows the broker-dealer sufficient time to process and submit the orders to the auction agent.  Other broker-dealers allow investors to submit orders up to the submission deadline, i.e., the deadline for all broker-dealers to submit orders to the auction agent. The broker-dealers must submit the orders to the auction agent before the submission deadline, and usually must identify each separate order.

59.     After receiving the orders from the broker-dealers, the auction agent calculates the clearing rate that will apply until the next auction.  If there is only one broker-dealer, however, as

was the case in many of the auctions managed by Goldman Sachs, the broker-dealer can discern the clearing rate before submitting orders to the auction agent.

60.     The auction agent allocates the securities to the broker-dealers based on the orders they submitted. The auction procedures generally state that orders are filled in the following order: hold orders, hold-at-rate and buy bids with a rate below the clearing rate, hold-at-rate orders with a rate at the clearing rate, and buy bids with a rate at the clearing rate.

61.     When there are more bids for securities at the clearing rate than securities remaining for sale, the securities are allocated on a pro rata basis first to the hold-at-rate bidders and then to the buy bidders. Generally, the auction procedures require broker-dealers to follow the same hierarchy in allocating the securities to their customers.

62.     From 1984 to 2006, the ARS market had grown to more than $200 billion annually, and the fees collected by the ten or so broker-dealers who dominated the market exceeded $600 million annually.

63.     The success of the ARS market at Goldman Sachs – on which Defendants' reputation and bonuses was based – depended on the perception that the market was extremely liquid. This is because the primary target customers for ARS are investors with short-term investment goals or cash-equivalent needs. Any hint that the ARS market was not liquid had the potential to trigger a massive sell-off by investors flocking to safer, more stable securities. Thus, a failed auction, or even the rumor of one, was something that Defendants sought to avoid at all cost, even if it meant steering the Company into an illegal course of action.

64.    In spite of this danger, in practice, the ARS auctions as a whole were not nearly liquid enough to support the billions of dollars' worth of these securities that broker-dealers such as Defendants caused Goldman Sachs to market to investors on a daily basis.

65.    It was in order to conceal the inherent illiquidity of the ARS market that Defendants and their counterparts at other broker-dealers caused Goldman Sachs and the other broker-dealers to engage in various practices designed to "support" the market, which they termed market "stabilization." In reality, however, the conduct was nothing short of the type of market manipulation scheme that the securities laws have, for generations, proscribed.

66.    Indeed, in an administrative proceeding dated May 31, 2006, the SEC found that Goldman Sachs and other broker-dealers had engaged in various illegal practices in order to make it appear that the auctions were successful and legitimate when, in fact, they were not. These actions, and the SEC's finding, were the direct and foreseeable consequence of Defendants' having knowingly encouraged the practices in question.

67.    For example, broker-dealers such as Goldman Sachs were found to have routinely taken over their customers' bid orders by filling in the blanks on open or market orders *after viewing other bidders' orders.* This practice allowed Goldman Sachs and other broker-dealers to bestow discounts on certain customers at the direct expense of other customers, and also allowed the broker-dealers to manipulate the clearing rate of the auction.

68.    In addition, broker-dealers could bid for their own accounts without disclosing this fact to customers, and the broker-dealers could ask their customers to change their orders, in both cases so as to allow the broker-dealer to:

(a)    prevent auctions from failing, thereby supporting the broker-dealers claim that the ARS market was very liquid and no auction had ever failed for want of orders; and

(b)    set artificial "market" rates, at levels essentially dictated solely by the broker-dealers themselves.

69.    The SEC also found that broker-dealers had rearranged bids through a process of "netting" of in-house buy and sell orders ahead of actual auctions in order to change the priority of bids. Thus, before submitting bids to the auction agent, broker-dealers changed or "prioritized" their customers' bids to increase the likelihood that the bids would be filled. As a result of this prioritization, as well as a similar practice known as "cross-trading," certain bids were secretly moved up in the disclosed hierarchy for the order in which bids of various types would be filled. In many instances, these practices resulted in certain customers' bids displacing other customers' bids when the auction was oversubscribed, which falsely affected the clearing rate, and did not conform to the disclosed procedures.

70.    The SEC also found that Goldman Sachs and other broker-dealers allowed the rampant submission or revision of bids after external and/or internal deadlines. In addition, the broker-dealers themselves submitted or revised bids after these deadlines. These practices favored investors or the broker-dealers who bid after a deadline by displacing other investors' bids, affected the clearing rate, and did not conform to the disclosed procedures.

71.    The SEC also found that broker-dealers such as Goldman Sachs had collaborated with certain of their customers by asking them to bid at auctions and then compensating them in the secondary market with rates that were higher than the clearing rate on the auction itself. For example, certain broker-dealers persuaded customers to submit bids at lower rates than the

customers actually wanted to receive, allowing the auction to clear at the lower rate, buying the securities from the investor after the auction at the clearing rate, and then selling the securities back to the investor at the same rate but below par value. Some broker-dealers did not even trouble themselves to convince customers to submit a "straw man" bid and, instead, simply displaced those customers' bids and then sold them securities at below par value in the secondary market. Also, some broker-dealers provided higher returns to certain customers by delaying settlement dates for those customers.

72.    Finally, the SEC found that certain broker-dealers provided different "price talks"[3] to different customers, placing certain customers at an advantage over others at the expense of the others.

73.    The SEC's findings demonstrated that Defendants, and their counterparts at other broker-dealers, had caused ARS auctions to be auctions in name only and, in fact, were an illegal market made and manipulated by the broker-dealers themselves. As a consequence of Defendants' and others' knowingly encouragement of these practices, fifteen broker-dealers, including Goldman Sachs, were fined $13 million, censured by the SEC, and ordered to cease and desist from those practices.

74.    Despite the fines and cease-and-desist orders imposed by the SEC, Defendants knowingly caused Goldman Sachs to continue to engage in various practices to artificially bolster the auction markets, exposing the Company to greatly enhanced criminal and civil liability.

_____

[3] Price talk is a broker-dealer's estimate of the likely range within which an auction will clear.

**After 2007, Defendants Abandon the Auction Market, and It Collapses**

75.    In 2007, a credit crisis of unprecedented levels swept across the United States economy that continues to roil the nation's financial markets.

76.    By the middle of 2007, banks had stopped financing private equity deals, the prices of U.S. residential real estate had gone into a steep decline, and the mortgage market for sub prime borrowers had essentially shut down. The collapse of the credit markets forced financial institutions such as Goldman Sachs to report tens of billions of dollars in losses and write downs. The collapse also began to infect the ARS market.

77.    By the middle of 2007, the demand for ARS by Goldman Sachs's corporate and institutional clients essentially dried up. This shift was driven, in large part, by a March 2007 decision by the Financial Accounting Standards Board ("FASB") requiring ARS to be listed on investors' balance sheets as "short-term investments" rather than "cash equivalents." Corporate investors responded to this by disposing of their ARS so that their balance sheet cash positions would not be reduced as result of the FASB decision, and their liquidity ratings would not suffer. As a consequence, Goldman Sachs was forced to retain more ARS inventory on its books than it could financially handle.

78.    Despite these developments, Defendants struggled to maintain the illusion of a healthy and liquid market for these securities at Goldman Sachs.

79.    Thus, rather than disclose the weakening demand for ARS, Defendants caused Goldman Sachs to *market ARS to customers even more intensely as a liquid cash alternative.* Indeed, Defendants caused Goldman Sachs to represent such securities expressly as "money market and auction instruments" in the Company's monthly account statements to customers.

80.     Defendants engaged in this conduct, among other reasons, so that Goldman Sachs could unload millions of dollars in ARS that the Company had in its inventory to its own customers before those securities became essentially worthless.

81.     By August 16, 2007, several monthly auctions had failed amidst the turmoil in the credit markets. Investors did not show to bid in auctions that month for about 60 auctions worth $6 billion of ARS. Also, some credit ratings agencies were advising that "they would not be surprised to see further failed auctions in the days or weeks ahead."

82.     Thereafter, auctions began failing with regularity, and those few that did succeed would have failed but for the intervention of Goldman Sachs and the other broker-dealers themselves. Defendants caused Goldman Sachs to continue to intervene so as to prop up the auction market by bidding with knowledge of other bids, by submitting bids after the internal bidding deadlines imposed on investors, and by directly or indirectly influencing or setting the clearing rates. In short, despite their awareness that there was, in fact, no legitimate auction demand for ARS, Defendants continued to actively market and sell ARS as a liquid cash alternative, exposing the Company to irremediable damage to its reputation and millions of dollars in civil and criminal penalties.

83.     Then, after unloading as many ARS as they could from Goldman Sachs's inventory onto unsuspecting customers, Defendants directed Goldman Sachs to stop supporting auctions altogether and simply "walk away" from the ARS market.

84.     Thus, on February 13, 2008, 87 percent of the auctions for ARS failed when Goldman Sachs and other broker-dealers were caused by Defendants and their counterparts to pull the plug.

Thousands of investors, holding millions of dollars of ARS purchased from Goldman Sachs, were now left with highly illiquid, and essentially worthless, investments.

85.     The debacle has had a ruinous impact on Goldman Sachs.  The Company received subpoenas from a number of state agencies relating to sales of ARS, including the New York State Attorney General and the Illinois Securities Department.   The SEC commenced a formal investigation.  At least three federal securities class actions have been commenced against the Company and its officers and directors: *Miller v. Goldman Sachs & Co., Incorporated* (S.D.N.Y. filed Mar. 25, 2008); *Jamail v. Goldman Sachs, et al.* (S.D.N.Y. Mar. 31, 2008); and *Bartholomew v. Goldman Sachs, et al.* (S.D.N.Y. filed May 28, 2008).

86.     On August 11, 2008, the New York Attorney General sent a letter to several broker-dealers warning that they were in "the next group of market participants" to be investigated and urging them to begin "immediate talks."  The Attorney General's letter noted that broker-dealers, such as Goldman Sachs, had made false representations concerning ARS that had harmed "tens of thousands of consumers nationwide," including "fail[ing] to disclose to their retail clients and other customers that from August of 2007 up until widespread auction failures, which occurred in the early part of 2008, the auction rate securities market only continued as a result of broker-dealers placing support bids."

87.     Only days after the New York Attorney General sent his letter – in what can only be characterized as an implicit admission of wrongdoing – Defendants announced that they had caused the Company to settle the Attorney General's charges.

88.     The settlement announced on August 21, 2008 was onerous and included the following terms:

(a)    By November 12, 2008, Goldman Sachs will purchase at par all ARS it sold to its "Private Wealth Management" clients and that are not currently clearing in auctions, in the amount of approximately **$1,500,000,000.00 par value**;

(b)    Goldman Sachs will pay damages to investors who sold ARS at a loss;

(c)    Goldman Sachs will submit to a public arbitration procedure to resolve claims of consequential damages suffered by retail investors as a result of not being able to access their funds, in which procedure the Company will be *precluded* from contesting liability;

(d)    Goldman Sachs will "expeditiously provide liquidity solutions for institutional investors";

(e)    Goldman Sachs will reimburse the refinancing fees of all municipal issuers of ARS who issued ARS through the Company from August 1, 2007 to February 11, 2008 and who refinanced those ARS after the latter date;

(f)    Goldman Sachs will pay a **$22,500,000.00 fine** to the State of New York and the North American Securities Administrators Association; and

(g)    Goldman Sachs "intends to fully cooperate with the SEC's ongoing investigation."

89.    Goldman Sachs's settlement with a few state agencies does not preclude private lawsuits on behalf of investors harmed by Defendants' actions. The settlements only cover the firm's Private Wealth Management clients – not large corporate customers who constituted the bulk of Goldman Sachs's ARS business. For example, *Financial Week* [6/2/08] reported that some corporate investors in ARS backed by collateralized debt obligations would have to take huge charges, as those ARS had become, for all intents and purposes, worthless:

Companies that held auction-rate paper backed by collateralized debt obligations, for example, had little hope of recovering their money and were more likely to take a charge. That happened at Bristol-Myers Squibb, whose ARS have a par value of $807 million. The company has taken $456 million in impairment charges, $300 million of which were permanent.

90.    Moreover, although the settlements require repurchases at par from the smaller investors, even those investors will have causes of action (e.g., for having had their assets frozen) against Goldman Sachs, exposing it to millions of dollars in damages.  Defendants conceded this point in consenting to an arbitration procedure to determine consequential damages.  Further, the settlements do not extend to investors holding ARS through mutual funds or brokerage firms that did not themselves underwrite the debt (as did Goldman Sachs).  Either these "downstream" purchasers -- or the mutual funds or brokerage firms which directly bought the debt through Goldman Sachs -- will have additional claims against the Company.  The amount of these private lawsuits will far exceed the amount of the Company's settlements with a few state agencies.

91.    Indeed, in settling with the New York and Illinois, Defendants were unable to effect a settlement with the SEC.  Shortly after the New York settlement was reached, Linda Thomsen, the SEC enforcement director, said the agency's investigation of Goldman Sachs and other broker-dealers was "ongoing."

92.    The economic impact on Goldman Sachs from Defendants' manipulation of the ARS market will be in the **tens of billions of dollars.**

## MATERIALLY FALSE AND MISLEADING
## STATEMENTS REGARDING DEFENDANTS' MANIPULATION
## OF THE ARS MARKET AND THE IMPACT ON GOLDMAN SACHS

93.     Throughout the Relevant Period, Defendants issued public statements about the financial condition of Goldman Sachs that were false because they omitted to disclose the Company's burgeoning exposure to losses on its inventories of ARS. Thus, while they were deceiving the Company's own customers, manipulating the market for ARS, and, by February 2008, unloading billions of dollars in illiquid ARS on unsuspecting investors, Defendants knowingly concealed from shareholders the fact that most of the ARS in its inventories were illiquid, unmarketable, and essentially worthless, knowingly failed to take necessary write downs on those securities, and knowingly exposed the Company to billions of dollars in liability for settlements and lawsuits arising from their fraudulent practices. Thus, from at least June 20, 2007 to August 21, 2008, each of Defendants' statements about the financial results of the Company was materially false and misleading, and Defendants knew or consciously disregarded this fact.

94.     On September 20, 2007, although Defendants' conscious manipulation of the ARS market and exposure of the Company to losses in the tens of billions of dollars was well under way, Defendants caused the company to issue a press release announcing very positive results for the second quarter of fiscal 2007 to the public, including shareholders. Defendants announced the Company's "second highest quarter" ever, including net revenues of $12.3 billion and net income of $2.9 billion. Of these record revenues, more than a third, $4.9 billion, had been generated from one single division within Trading and Principal Investments, namely, the FICC group which included ARS. Defendants stated: "FICC benefited from strong customer-driven activity and favorable market opportunities" during the second quarter.

95.     The press release and Form 10-Q filed with the SEC confirming these results were false and misleading in that Defendants did not make any mention of the illiquidity of the ARS market on which FICC's fortunes in part depended, or Defendants' manipulation thereof, or the Company's multi-billion-dollar exposure thereto.   This act constituted a deliberate, material omission of the fact that Goldman Sachs was exposed to tens of billions of dollars in ARS losses, write downs, and settlements.

96.     On November 13, 2007, defendant Blankfein gave a presentation to the Merrill Lynch Financial Services Conference.  In his presentation, Blankfein highlighted the importance of FICC, which as a single division had provided, on average, 33 percent of the Company's revenues since 1999.  In addition, Blankfein stressed the Company's firm-wide risk management capabilities.

97.     The presentation was false and misleading in that Defendants did not make any mention of the illiquidity of the ARS market on which the Company's fortunes in part depended, or Defendants' manipulation thereof, or the Company's multi-billion-dollar exposure thereto. This act constituted a deliberate, material omission of the fact that Goldman Sachs was exposed to tens of billions of dollars in ARS losses, write downs, and settlements.

98.     On December 18, 2007, Defendants caused the company to issue a press release announcing its results for the fourth quarter and full fiscal year 2007 to the public, including shareholders. Defendants announced "record" full-year net revenues of $46 billion and net income of $11.6 billion. Defendants reported that FICC alone had generated "net revenues of $16.17 billion, 13% higher than the previous record set in 2006, reflecting significantly higher net revenues in currencies and interest rate products."

99.     The press release and Form 10-K filed with the SEC confirming these results were false and misleading in that Defendants did not make any mention of the illiquidity of the ARS market on which FICC's fortunes in part depended, or Defendants' manipulation thereof, or the Company's multi-billion-dollar exposure thereto.  These acts constituted a deliberate, material omission of the fact that Goldman Sachs was exposed to tens of billions of dollars in ARS losses, write downs, and settlements.

100.    On February 6, 2008, defendant Viniar gave a presentation to the 2008 Credit Suisse Financial Services Conference.  In his presentation, Defendants highlighted the Company's growing revenues, based mainly on FICC.  Viniar again stressed the Company's firm-wide risk management capabilities.

101.    The presentation was false and misleading in that Defendants did not make any mention of the illiquidity of the ARS market on which the Company's fortunes in part depended, or Defendants' manipulation thereof, or the Company's multi-billion-dollar exposure thereto.  This act constituted a deliberate, material omission of the fact that Goldman Sachs was exposed to tens of billions of dollars in ARS losses, write downs, and settlements.

102.    On March 18, 2008, Defendants caused the company to issue a press release announcing its results for the first fiscal quarter 2008 to the public, including shareholders.  Defendants announced that net revenues were $8.3 billion, and net income was $1.5 billion.  Once again, FICC led the way in results:  its revenues of $3.1 billion "included particularly strong performance in interest rate products" such as ARS, as well as "currencies and commodities."  Indeed, although revenues were down at FICC overall due to losses in residential mortgage loans and securities, "results were strong" "[a]cross the broader franchise in FICC, activity levels were

high and results were strong. *Net revenues in interest rate products, currencies and commodities were significantly higher compared with the same prior year period.*" (Emphasis added.)

103.   The press release and Form 10-Q filed with the SEC confirming these results were false and misleading in that Defendants did not make any mention of the illiquidity of the ARS market on which FICC's fortunes in part depended, or Defendants' manipulation thereof, or the Company's multi-billion-dollar exposure thereto.  These acts constituted a deliberate, material omission of the fact that Goldman Sachs was exposed to tens of billions of dollars in ARS losses, write downs, and settlements.

104.   On June 17, 2008, Defendants caused the company to issue a press release announcing its results for the second fiscal quarter 2008 to the public, including shareholders. Defendants announced that net revenues were $9.4 billion and net income was $2.1 billion.  Net revenues at FICC were $2.4 billion, 29 percent lower than the second quarter of 2007.  Once again, however, Defendants stressed the supposedly positive results from ARS and similar securities: although FICC had experienced a decrease in revenues from credit products, this "was partially offset by higher net revenues in . . . interest rate products," including ARS, among others.

105.   The press release and Form 10-Q filed with the SEC confirming these results were false and misleading in that Defendants did not make any mention of the illiquidity of the ARS market on which FICC's fortunes in part depended, or Defendants' manipulation thereof, or the Company's multi-billion-dollar exposure thereto.  Defendants continued to highlight the profitability of interest rate trading activities, including ARS.  These acts constituted a deliberate, material omission of the fact that Goldman Sachs was exposed to tens of billions of dollars in ARS losses, write downs, and settlements.

## THE TRUE FACTS ARE BELATEDLY DISCLOSED

106.    The truth concerning Defendants' deliberate misstatements and omissions to shareholders only began to emerge in early August 2008, when Defendants announced the settlements with state regulators which will have a **multi-billion dollar** impact on the Company.

## INSIDER SELLING

107.    Between June 20, 2007 and the present, during the height of Defendants' deception of customers in, and manipulation of, the ARS market and the aftermath of these actions, defendants **Blankfein, Winkelreid, Cohn, Cohen, and Viniar** (the "Insider Selling Defendants"), while in possession of material, non-public information regarding the Company's exposure to losses, settlements, and liability in the ARS market, sold almost $70 **million** in Goldman Sachs stock on the basis of their inside information.

108.    Each of the Insider Selling Defendants sold stock in the amounts set forth in paragraphs 21-23 and 34-35, *supra.*

109.    The sales by the Insider Selling Defendants constituted a breach of their fiduciary duties to the Company.  In addition, it violated Goldman Sachs's corporate policy as contained in numerous protocols such as the Company's Code of Business Conduct and Ethics.

## ADDITIONAL BREACHES OF FIDUCIARY
## DUTIES AND GROSS MISMANAGEMENT

110.    The Defendants breached their duties of loyalty and good faith by allowing or causing the Company to misrepresent its financial results and prospects, as detailed herein, and by failing to prevent illegal actions related to the misrepresentation.

111.    As set forth above, Defendants had a duty to Goldman Sachs that the Company's financial reporting fairly presented, in all material respects, the operations and financial condition of

the Company.  In order to adequately carry out this duty, it is and was necessary for the Defendants to know and understand the material, non-public information to be either disclosed or omitted from the Company's public statements.  Here, this material, non-public information included: (i) the fact that the Company was taking advantage of investors and customers in its ARS line of business and manipulating the market for these securities; and (ii) the fact that the Company's financial statements were materially misstated due to, among other things, Defendants' failure to properly value, and discount, the ARS in its portfolio due to their inherent illiquidity.

112.    Furthermore, the Director Defendants, as members of the respective committees of the Board, had special duties that included knowing and understanding the material information as set out in the charters of each of the respective committees, which provides that each committee's responsibilities include: (i) overseeing evaluation of the Company's internal accounting controls; (ii) reviewing the Company's financial reports and accounting standards and principles; and (iii) overseeing internal audits.  It was also the duty and responsibility of the Audit Committee to communicate the results of its exercise of reasonable judgment to the full Board of Directors and for the full Board to ultimately monitor and oversee the Audit Committee itself.

113.    The Officer Defendants had ample opportunity to discuss this material information with their fellow officers at management meetings and via internal corporate documents and reports. Moreover, the Director Defendants had a duty to discuss this material information with management and fellow directors at any of the Board's meetings or at any of the meeting of the committees of the Board.

114.    The Defendants' conduct as set forth herein constituted conscious misbehavior and recklessness. Each of the Officer Defendants was charged with overseeing the risk, valuation, and

integrity of the Company's loan portfolios and capital position, and each of the Director Defendants was not only responsible for the Company's financial well-being as a whole but also sat on one or more committees of the Board specifically requiring him or her to be actively involved in the oversight of the officers managing the Company's portfolio: (a) **Liddy (Chair), Bryan, Dahlback, Friedman, George, Gupta, Johnson, Juliber, and Mittal** (Audit Committee); (b) **Johnson (Chair), Bryan, Dahlback, Friedman, George, Gupta, Juliber, Liddy, Mittal, and Simmons** (Compensation Committee); and (c) **Bryan (Chair), Dahlback, Friedman, George, Gupta, Johnson, Juliber, Liddy, Mittal, and Simmons** (Corporate Governance and Nominating Committee). Each of these Committees did, in fact, actively direct and control the Company's affairs during the Relevant Period. In 2007, the full Board met 10 times, the Audit Committee met 10 times, the Compensation Committee met 6 times, and the Corporate Governance and Nominating Committee met 5 times.

## ADDITIONAL DAMAGES TO GOLDMAN SACHS AND SHAREHOLDERS

115.    As a result of Defendants' illegal actions and course of conduct during the Relevant Period, the Company is now subject to drastically increased costs, both of operating in the normal course, and of satisfying extraordinary obligations incurred as a result of Defendants' malfeasance. Such expenditures include, but are not limited to:

(a)    costs incurred in connection with the investigation by the New York Attorney General;

(b)    costs incurred in connection with the investigation by the SEC, which is ongoing;

(c)     costs incurred in connection with the investigation by other state and/or federal agencies;

(d)     costs incurred in connection with defending investor class actions related to Defendants' manipulation of the market for ARS, expected to reach billions of dollars in legal fees and settlement costs;

(e)     costs incurred to correct the Company's internal control procedures to material weaknesses in the Company's valuations of its ARS assets;

(f)     increased costs of capital as a result of a lowered share price;

(g)     additional billions of dollars in settlements to satisfy adverse judgments and/or potential fines in connection with other government investigations;

(h)     costs incurred from increased Directors and Officers' Insurance ("D&O Insurance") premiums as a result of the manipulation of the ARS market;

(i)     costs incurred from potential losses of large trading partners who do not want to be associated with businesses that improperly manage their issuance, sales, marketing, and accounting of derivative securities like ARS; and

(j)     costs of downgrades of Goldman Sachs's debt and securities by financial analysts and creditors, due to concerns about the Company's financial reporting.

116.    The Defendants' actions have irreparably damaged Goldman Sachs's corporate image and goodwill.

## DEFENDANTS' DUTIES

117.    Defendants had stringent duties to Goldman Sachs and its shareholders. These duties arose by operation of law and were imposed upon them by the Company, by virtue of their positions at the Company.

### Duties at Law

118.    By reason of their positions as officers, directors, and/or fiduciaries of Goldman Sachs and because of their ability to control the business and corporate affairs of Goldman Sachs, the Defendants owed Goldman Sachs and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Goldman Sachs in a fair, just, honest and equitable manner. The Defendants were and are required to act in furtherance of the best interests of Goldman Sachs and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

119.    Each director and officer of the Company owes to Goldman Sachs and its shareholders the fiduciary duty to exercise good faith, loyalty, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and to uphold the highest obligations of fair dealing. In addition, as officers and/or directors of a publicly held company, the Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's revenue, margins, operations, performance, management, projections and forecasts so that the market price of the Company's stock would be based on truthful and accurate information. In order to adequately carry out these duties, it is necessary for the Defendants to know and understand the material, non-public information that should be either disclosed or not disclosed in the Company's public statements.

120.    The Defendants, because of their positions of control and authority as directors and/or officers of Goldman Sachs, were able to, and did, exercise control over the wrongful acts complained of herein and over the contents of the various public statements issued by the Company. Because of their advisory, executive, managerial and directorial positions with Goldman Sachs, each of the Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of Goldman Sachs.

121.    To discharge their duties, the officers and directors of Goldman Sachs were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of Goldman Sachs were required to, among other things:

(i)      refrain from acting in any manner so as to favor the personal interest of the directors or officers of the Company at the expense of the best interest of the Company and its shareholders;

(ii)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate information to shareholders, the investing public, and the SEC;

(iii)    conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the Company's value;

(iv)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an

adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(v)    ensure that management was conducting legal, fair, and honest transactions with customers, and was not employing artifices or manipulations to maintain so-called "liquid" markets in securities, including ARS, that were not, in fact, liquid;

(vi)    ensure that financial records and asset values were true, accurate and reliable and that such values reflected the real (even if impaired) value of such assets, including ARS;

(vii)    remain informed as to how Goldman Sachs conducted its operations, and, upon receipt or notice of information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws;

(viii)    ensure that the Company was operated in a diligent, honest and prudent manner in compliance with all applicable federal, state and local laws, rules and regulations;

(ix)    ensure that sufficient checks and balances in Goldman Sachs's accounting and finance functions, and related functions, were strong enough to prevent accounting irregularities, internal-controls problems, misevaluation of ARS, manipulation of customer orders for ARS, and deception regarding ARS;

(x)    ensure that no inaccurate financial information about Goldman Sachs was released to the public that would tend to artificially inflate Goldman Sachs's stock, and that

would thus cause corresponding or greater harm to the Company's value when the truth was revealed; and

(xi)   ensure that valuable corporate assets would not be wasted in excessive compensation payments in 2006 and 2007 to executives who ruined the financial health and stability of the Company.

122.   Each Defendant, by virtue of his or her position as a director and/or officer of Goldman Sachs, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Goldman Sachs, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders.

123.   The Defendants were aware, or should have been aware, that those violations, absences of good faith, and the reckless disregard of duties posed a risk of serious injury to the Company. The conduct of the Defendants who were also officers and/or directors of the Company during the relevant period has been ratified by the remaining Defendants who collectively comprised all of Goldman Sachs's Board during the relevant period.

### Corporate Duties

124.   Goldman Sachs adopted "Corporate Governance Guidelines" in 2007 to ensure the faithful fulfillment of the codes of conduct and the duties of officers and directors:

II. Board Composition and Size

The members of the Board should collectively possess a broad range of skills, expertise, industry and other knowledge, and business and other experience useful to

the effective oversight of the Company's business. A majority of the Board shall consist of directors who the Board has determined are "independent" under the rules of the New York Stock Exchange, Inc. (an "Independent Director"). It is the sense of the Board that, absent special circumstances, the Board should consist of no more than 15 members in order to facilitate its functioning.

III. Selection of Chairman of the Board and Chief Executive Officer

The Board shall select its chairman (the "Chairman") and the Company's chief executive officer (the "CEO") in any way it considers in the best interests of the Company. Therefore, the Board does not have a policy on whether the role of Chairman and CEO should be separate or combined and, if it is to be separate, whether the Chairman should be selected from the independent directors or should be an employee of the Company.

IV. Selection of Directors

*Nominations and Appointments.* The Board's Corporate Governance and Nominating Committee shall be responsible for identifying and recommending to the Board qualified candidates for Board membership, based primarily on the following criteria:

• Judgment, character, expertise, skills and knowledge useful to the oversight of the Company's business;

• Diversity of viewpoints, backgrounds, experiences, and other demographics;

• Business or other relevant experience; and

• The extent to which the interplay of the candidate's expertise, skills, knowledge and experience with that of other Board members will build a Board that is effective, collegial and responsive to the needs of the Company.

The Corporate Governance and Nominating Committee shall give appropriate consideration to candidates for Board membership nominated by shareholders in accordance with the Company's by-laws, and shall evaluate such candidates in the same manner as other candidates identified to the Committee. The Committee may use outside consultants to assist in identifying candidates. Members of the Corporate Governance and Nominating Committee discuss and evaluate possible candidates in detail prior to recommending them to the Board.

The Corporate Governance and Nominating Committee shall also be responsible for initially assessing whether a candidate would be an Independent Director. The Board, taking into consideration the recommendations of the Corporate Governance and Nominating Committee, shall be responsible for selecting the nominees for election

to the Board by the shareholders and for appointing directors to the Board to fill vacancies, with primary emphasis on the criteria set forth above. The Board, taking into consideration the assessment of the Corporate Governance and Nominating Committee, shall also make a determination as to whether a nominee or appointee would be an Independent Director.

*Invitations.* The invitation to join the Board shall be extended by the Board via the Chairman and either the chairperson of the Corporate Governance and Nominating Committee or another independent director of the Company designated by the Chairman and the chairperson of the Corporate Governance and Nominating Committee.

V. Continuation as a Director

*Review of Continuation Based on Age.* Upon attaining the age of 72 and annually thereafter, a director shall tender such director's proposed retirement from the Board to the chairperson of the Corporate Governance and Nominating Committee (or, in the case of the chairperson of the Corporate Governance and Nominating Committee attaining age 72, to the Chairman of the Board). The Corporate Governance and Nominating Committee shall review the director's continuation on the Board, and recommend to the Board whether, in light of all the circumstances, the Board should accept such proposed retirement or request that the director continue to serve.

*Resignation of the Company's Chairman or CEO.* A Chairman or CEO of the Company who resigns from that position shall tender to the chairperson of the Corporate Governance and Nominating Committee such Chairman or CEO's proposed resignation from the Board. The Corporate Governance and Nominating Committee shall review the director's continuation on the Board, and, in the case of a resignation tendered other than pursuant to Section 2.2 of the Company's By-Laws, recommend to the Board whether, in light of all the circumstances, the Board should accept such proposed resignation or request that the director continue to serve or, in the case of a resignation required to be tendered pursuant to Section 2.2 of the Company's By-Laws, to assess whether a significant reason for the director to remain as a director exists and recommend to the Board whether, in light of the existence or absence of such reason, the Board should accept such proposed resignation.

*Change In Job Responsibility.* Each time a director's principal occupation or business association changes substantially, the director shall tender such director's proposed resignation from the Board to the chairperson of the Corporate Governance and Nominating Committee (or, in the case of the chairperson of the Corporate Governance and Nominating Committee's occupation or association changing, to the Chairman of the Board). The Corporate Governance and Nominating Committee shall review the director's continuation on the Board, and recommend to the Board

whether, in light of all the circumstances, the Board should accept such proposed resignation or request that the director continue to serve.

## VI. The Committees of the Board

The Board shall have at least three committees: the Audit Committee, the Compensation Committee and the Corporate Governance and Nominating Committee (the "Committees"). Each Committee shall have a written charter. The Board expects to accomplish a substantial amount of its work through the Committees. Each Committee shall report regularly to the Board summarizing the Committee's actions and any significant issues considered by the Committee.

Each of the Audit Committee, the Compensation Committee and the Corporate Governance and Nominating Committee shall be composed of no fewer than three members. Each Committee member must satisfy the membership requirements set forth in the relevant Committee charter. A director may serve on more than one Committee. The Corporate Governance and Nominating Committee shall be responsible for identifying Board members qualified to fill vacancies on any Committee and recommending that the Board appoint the identified member or members to the applicable Committee. The Board, taking into account the views of the Chairman, shall designate one member of each Committee as chairperson of such Committee. It is the sense of the Board and the Corporate Governance and Nominating Committee that consideration should be given to rotating members of the Committees periodically at about a six-year interval, but they do not believe that such a rotation should be mandated as a policy since there may be reasons at a given point in time to maintain an individual director's committee membership for a longer period.

## VII. Board and Committee Meetings

The Board shall have at least five meetings each year. Further meetings shall occur if called by the Board, the Chairman, the chairperson of the Corporate Governance and Nominating Committee, any vice chairman of the Board, the CEO, a president, a chief operating officer or any two directors. The Board may act by unanimous written consent in lieu of a meeting.

Each Committee shall have the number of meetings provided for in its charter, with further meetings to occur (or action to be taken by unanimous written consent) when deemed necessary or desirable by the Committee or its chairperson.

The agenda for each Board meeting shall be established by the Chairman and CEO. Any Board member may suggest the inclusion of additional subjects on the agenda. The agenda for each Committee meeting shall be established by the Committee chairperson in consultation with appropriate members of the Committee and with management. Although management will seek to provide appropriate materials in

advance of Board and Committee meetings, this will not always be consistent with the timing of transactions and the operations of the business, and in certain cases it may not be possible to circulate materials in advance of the meeting. Materials presented to the Board and Committee members should provide the information needed for the directors to make an informed judgment or engage in informed discussion. At least annually, the Chairman and CEO shall issue to the other Board members a schedule of the foreseeable primary agenda subjects intended to be discussed by the Board, and each Committee's chairperson shall issue to the other Committee members a schedule of the foreseeable primary agenda subjects intended to be discussed by the Committee. Unless a Committee expressly determines otherwise, the agenda, materials and minutes for each Committee meeting shall be available to all directors, and all directors shall be free to attend any Committee meeting. In addition, all directors, whether or not members of the Committee, shall be free to make suggestions to a Committee chairperson for additions to the agenda of his or her Committee or to request that an item from a Committee agenda be considered by the Board.

VIII. Executive Sessions and the Presiding Director

To ensure free and open discussion and communication among the nonmanagement directors, these directors shall meet in executive session at least twice a year with no members of management present. The chairperson of the Corporate Governance and Nominating Committee shall preside at the executive sessions (in such capacity, the "Presiding Director"), unless the non-management directors determine otherwise. Each non-management director shall have the authority to call executive sessions. In addition to presiding at the executive sessions of the non-management directors, the Presiding Director's duties shall include:

• advising the Chairman and CEO of decisions reached, and suggestions made, at executive sessions;

• presiding at each Board meeting at which the Chairman is not present;

• reviewing the agenda and schedule for each Board meeting and executive session; and

• facilitating communication between the non-management directors and the Chairman and CEO.

IX. Board Responsibilities

The business and affairs of the Company are managed by or under the direction of the Board in accordance with Delaware law. The Board's responsibility is to provide direction and oversight. The Board establishes the strategic direction of the Company and oversees the performance of the Company's business and management. The

management of the Company is responsible for presenting strategic plans to the Board for review and approval and for implementing the Company's strategic direction. In performing their duties, the primary responsibility of the directors is to exercise their business judgment in the best interests of the Company.

Certain specific corporate governance functions of the Board are set forth below:

1. *Management Succession*. The Board, acting through the Corporate Governance and Nominating Committee, shall review and concur in a management succession plan, developed by the CEO, to ensure a continuity in senior management. This plan, on which the CEO shall report at least annually, shall address:

• emergency CEO succession;

• CEO succession in the ordinary course of business; and

• succession for the other members of senior management.

The plan shall include an assessment of senior management experience, performance, skills and planned career paths.

2. *Evaluating the CEO*. The Board, acting through the Corporate Governance and Nominating Committee, shall annually conduct an evaluation of the performance of the CEO. The chairperson of the Corporate Governance and Nominating Committee shall communicate such evaluation to the CEO and the chairperson of the Compensation Committee.

3. *Director Compensation*. The Corporate Governance and Nominating Committee shall periodically review the form and amounts of director compensation and make recommendations to the Board with respect thereto. The Board shall set the form and amounts of director compensation, taking into account the recommendations of the Corporate Governance and Nominating Committee. The Board believes that the amount of director compensation should fairly reflect the contributions of the directors to the performance of the Company. Management shall at least annually prepare and provide to the chairperson of the Corporate Governance and Nominating Committee a report on the director compensation policies and practices of the Company's principal competitors and other comparable companies. Only non-management directors shall receive compensation for services as a director. To create a direct linkage with corporate performance, the Board believes that a meaningful portion of the total compensation of non-management directors should be provided and held in common stock, stock options, restricted stock units or other types of equity-based compensation.

4. *Reviewing and Approving Significant Transactions*. Board approval of a particular transaction may be appropriate because of several factors, including:

- legal or regulatory requirements,

- the materiality of the transaction to the Company's financial performance, risk profile or business,

- the terms of the transaction, or

- other factors, such as the entering into of a new line of business or a variation from the Company's strategic plan.

To the extent the Board determines it to be appropriate, the Board shall develop standards to be utilized by management in determining types of transactions that should be submitted to the Board for review and approval or notification.

X. Expectations for Directors

The Board has developed a number of specific expectations of directors to promote the discharge by the directors of their responsibilities and to promote the efficient conduct of the Board's business. It is understood that the independent directors are not full-time employees of the Company.

1. *Commitment and Attendance.* All directors should make every effort to attend meetings of the Board and the Committees of which they are members. Attendance by telephone or video conference may be used to facilitate a director's attendance.

2. *Participation in Meetings.* Each director should be sufficiently familiar with the business of the Company, including its financial statements and capital structure, and the risks and the competition it faces, to ensure active and effective participation in the deliberations of the Board and of each Committee on which he or she serves. Upon request, management shall make appropriate personnel available to answer any questions a director may have about any aspect of the Company's business. Directors should also review the materials provided by management and advisors in advance of the meetings of the Board and its Committees and should arrive prepared to discuss the issues presented.

3. *Loyalty and Ethics.* In their roles as directors, all directors owe a duty of loyalty to the Company. This duty of loyalty mandates that the best interests of the Company take precedence over any interest possessed by a director. The Company has adopted a Code of Business Conduct and Ethics. Certain portions of the Code deal with activities of directors, particularly with respect to potential conflicts of interest, the taking of corporate opportunities for personal use, and transactions in the securities of the Company. Directors should be familiar with the Code's provisions in these areas and should consult with one of the Company's General Counsel in the event of any issues. Directors are permitted to maintain brokerage or similar accounts with the Company's affiliates, purchase investment services, investment products, securities

or similar products and services from the Company or its affiliates or invest in partnerships or funds sponsored or managed by the Company or its affiliates. All such accounts and services are provided on substantially the same terms and conditions as those prevailing at the time for similarly situated persons who are not directors of the Company.

4. *Non-employee Director Stock Ownership.* The Board believes that it is important for each director to have a financial stake in the Company to help align the director's interests with those of the Company's shareholders. To meet this objective, it is the policy of the Board that each director who is not an employee of the Company or its affiliates (a "Non-employee Director") must maintain beneficial ownership of at least 5,000 shares of the Company's common stock and/or fully vested restricted stock units at all times during his or her tenure on the Board, provided that new Non-employee Directors will have up to two years of service on the Board to meet this ownership requirement.

5. *Other Directorships and Significant Activities.* The Company values the experience directors bring from other boards on which they serve and other activities in which they participate, but recognizes that those boards and activities may also present demands on a director's time and availability and may present conflicts or legal issues, including independence issues. Directors should advise the chairperson of the Corporate Governance and Nominating Committee and the CEO before accepting membership on other boards of directors or any audit committee or other significant committee assignment on any other board of directors, or establishing other significant relationships with businesses, institutions, governmental units or regulatory entities, particularly those that may result in significant time commitments or a change in the director's relationship to the Company.

6. *Contact with Management and Employees.* All directors shall be free to contact the CEO at any time to discuss any aspect of the Company's business. Directors shall also have complete access to other employees of the Company. The Board expects that there will be frequent opportunities for directors to meet with the CEO and other members of management in Board and Committee meetings, or in other formal or informal settings. Further, the Board encourages management to bring into Board meetings from time to time (or otherwise make available to Board members) individuals who can provide additional insight into the items being discussed because of personal involvement and substantial knowledge in those areas.

7. *Speaking on Behalf of the Company.* It is important that the Company speak to employees and outside constituencies with a single voice, and that management serve as the primary spokesperson. If a situation does arise in which it seems necessary for a Non-employee Director to speak on behalf of the Company to one of these constituencies, the director should consult with the CEO.

8. *Confidentiality.* The proceedings and deliberations of the Board and its committees shall be confidential. Each director shall maintain the confidentiality of information received in connection with his or her service as a director.

XI. Evaluating Board and Committee Performance

The Board, acting through the Corporate Governance and Nominating Committee, shall conduct an annual self-evaluation. Each Committee shall conduct an annual self-evaluation as provided for in its respective charter.

XII. Orientation and Continuing Education

Management, working with the Board, shall provide an orientation process for new directors, including background material on the Company and its business. As appropriate, management shall prepare additional educational sessions for directors on matters relevant to the Company and its business.

XIII. Reliance on Management and Outside Advice

In performing its functions the Board shall be entitled to rely on the advice, reports and opinions of management, counsel, accountants, auditors and other expert advisors. Except as otherwise provided in a charter of a Committee, the Board shall have the authority to select, retain, terminate and approve the fees and other retention terms of its outside advisors.

125.    Goldman Sachs also had a "Code of Business Conduct and Ethics" applicable to the

entire Company, including Defendants:

This Code of Business Conduct and Ethics (the "Code") embodies the commitment of The Goldman Sachs Group, Inc. and its subsidiaries to conduct our business in accordance with all applicable laws, rules and regulations and the highest ethical standards. All employees and members of our Board of Directors are expected to adhere to those principles and procedures set forth in this Code that apply to them. We also expect the consultants we retain generally to abide by this Code. (For purposes of Section 406 of the Sarbanes-Oxley Act of 2002 and the rules promulgated thereunder, Section I of this Code shall be our code of ethics for Senior Financial Officers (as defined below).) The Code should be read in conjunction with Our Business Principles, which provide in part that, "Integrity and honesty are at the heart of our business. We expect our people to maintain high ethical standards in everything they do, both in their work for the firm and in their personal lives." Our Business Principles are attached to this Code. Each employee, consultant and director should also read and be familiar with the portions of the Compendium of Firmwide Compliance Policies (the "Compendium") applicable to such employee, consultant or director, which Compendium is not part of this Code.

SECTION I

A. Compliance and Reporting

Employees and directors should strive to identify and raise potential issues before they lead to problems, and should ask about the application of this Code whenever in doubt. Any employee or director who becomes aware of any existing or potential violation of this Code should promptly notify, in the case of employees, an appropriate contact listed in the Directory of Contacts included in the Compendium and, in the case of directors and the Chief Executive Officer, the Chief Financial Officer and the Principal Accounting Officer (the "Senior Financial Officers"), one of the firm's General Counsel (we refer to such contacts as "Appropriate Ethics Contacts"). The firm will take such disciplinary or preventive action as it deems appropriate to address any existing or potential violation of this Code brought to its attention. Any questions relating to how these policies should be interpreted or applied should be addressed to an Appropriate Ethics Contact.

B. Personal Conflicts of Interest

A "personal conflict of interest" occurs when an individual's private interest improperly interferes with the interests of the firm. Personal conflicts of interest are prohibited as a matter of firm policy, unless they have been approved by the firm. In particular, an employee or director must never use or attempt to use his or her position at the firm to obtain any improper personal benefit for himself or herself, for his or her family members, or for any other person, including loans or guarantees of obligations, from any person or entity.   Service to the firm should never be subordinated to personal gain and advantage. Conflicts of interest should, to the extent possible, be avoided.

Any employee or director who is aware of a material transaction or relationship that could reasonably be expected to give rise to a conflict of interest should discuss the

matter promptly with an Appropriate Ethics Contact.

C. Public Disclosure

It is the firm's policy that the information in its public communications, including SEC filings, be full, fair, accurate, timely and understandable. All employees and directors who are involved in the company's disclosure process, including the Senior Financial Officers, are responsible for acting in furtherance of this policy. In particular, these individuals are required to maintain familiarity with the disclosure requirements applicable to the firm and are prohibited from knowingly misrepresenting, omitting, or causing others to misrepresent or omit, material facts about the firm to others, whether within or outside the firm, including the firm's independent auditors. In addition, any employee or director who has a supervisory

role in the firm's disclosure process has an obligation to discharge his or her responsibilities diligently.

D. Compliance with Laws, Rules and Regulations

It is the firm's policy to comply with all applicable laws, rules and regulations. It is the personal responsibility of each employee and director to adhere to the standards and restrictions imposed by those laws, rules and regulations. The Compendium provides guidance as to certain of the laws, rules and regulations that apply to the firm's activities.

Generally, it is both illegal and against firm policy for any employee or director who is aware of material nonpublic information relating to the firm, any of the firm's clients or any other private or governmental issuer of securities to buy or sell any securities of those issuers, or recommend that another person buy, sell or hold the securities of those issuers.

More detailed rules governing the trading of securities by the firm's employees and directors are set forth in the Compendium. Any employee or director who is uncertain about the legal rules involving his or her purchase or sale of any firm securities or any securities in issuers that he or she is familiar with by virtue of his or her work for the firm should consult with an Appropriate Ethics Contact before making any such purchase or sale.

SECTION II

A. Corporate Opportunities

Employees and directors owe a duty to the firm to advance the firm's legitimate business interests when the opportunity to do so arises. Employees and directors are prohibited from taking for themselves (or directing to a third party) a business opportunity that is discovered through the use of corporate property, information or position, unless the firm has already been offered the opportunity and turned it down. More generally, employees and directors are prohibited from using corporate property, information or position for personal gain or competing with the firm. Sometimes the line between personal and firm benefits is difficult to draw, and sometimes both personal and firm benefits may be derived from certain activities. The only prudent course of conduct for our employees and directors is to make sure that any use of firm property or services that is not solely for the benefit of the firm is approved beforehand through the Appropriate Ethics Contact.

B. Confidentiality

In carrying out the firm's business, employees and directors often learn confidential or proprietary information about the firm, its clients/customers, prospective

clients/customers or other third parties. Employees and directors must maintain the confidentiality of all information so entrusted to them, except when disclosure is authorized or legally mandated. Confidential or proprietary information includes, among other things, any non-public information concerning the firm, including its businesses, financial performance, results or prospects, and any non-public information provided by a third party with the expectation that the information will be kept confidential and used solely for the business purpose for which it was conveyed. Employees and directors should refer to the policies set forth in the Compendium under "The Use and Misuse of Information – Policies and Procedures Regarding Confidential or Proprietary Information, The Chinese Wall" and "Additional Policies Regarding the Protection of Information – Intellectual Property Belonging to Goldman Sachs" for more detailed guidance on this topic.

C. Fair Dealing

We have a history of succeeding through honest business competition. We do not seek competitive advantages through illegal or unethical business practices. Each employee and director should endeavor to deal fairly with the firm's clients, service providers, suppliers, competitors and employees. No employee or director should take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts, or any unfair dealing practice.

D. Equal Employment Opportunity and Harassment

Our focus in personnel decisions is on merit and contribution to the firm's success. Concern for the personal dignity and individual worth of every person is an indispensable element in the standard of conduct that we have set for ourselves. The firm affords equal employment opportunity to all qualified persons without regard to any impermissible criterion or circumstance. This means equal opportunity in regard to each individual's terms and conditions of employment and in regard to any other matter that affects in any way the working environment of the employee. We do not tolerate or condone any type of discrimination prohibited by law, including harassment.

E. Protection and Proper Use of Firm Assets

All employees should protect the firm's assets and ensure their efficient use. All firm assets should be used for legitimate business purposes only.

SECTION III.

Waivers of This Code

From time to time, the firm may waive certain provisions of this Code. Any employee or director who believes that a waiver may be called for should discuss the matter with an Appropriate Ethics Contact. Waivers for executive officers (including Senior Financial Officers) or directors of the firm may be made only by the Board of Directors or a committee of the Board.

126.   In addition, the charters of the various Committees of the Company's Board also imposed enhanced duties on the Director Defendants sitting on those Committees.

127.   Pursuant to its Charter, the Audit Committee had the following duties and responsibilities:

1. To meet with the independent auditors and the Company's management, Director of Internal Audit and such other personnel as it deems appropriate and discuss such matters as it considers appropriate, including the matters referred to below. The Committee must meet separately with the independent auditors, the Company's management, and the Director of Internal Audit periodically, normally at least once each fiscal quarter.

2. To decide whether to appoint, retain or terminate the Company's independent auditors and to pre-approve all audit, audit-related, tax and other services, if any, to be provided by the independent auditors. The Committee shall monitor and evaluate the auditors' qualifications, performance and independence on an ongoing basis, and shall be directly responsible for the compensation and oversight of the work of the independent auditors (including resolving disagreements between management and the auditor regarding financial reporting).

In conducting such evaluations, the Committee shall:

• At least annually, obtain and review a report by the independent auditors describing: the auditors' internal quality-control procedures; any material issues raised by the most recent internal quality-control review or peer review of the auditors, or by any inquiry or investigation by governmental or professional authorities, within the preceding five years, respecting one or more independent audits carried out by the auditors, and any steps taken to deal with any such issues; and (to assess the auditors' independence) all relationships between the independent auditors and the Company (including information the Company determines is required to be disclosed in the Company's proxy statement as to services for audit, audit-related, tax and other services, if any, provided to the Company and those disclosures required by Independence Standards Board Standard No. 1, as it may be modified or supplemented).

• Discuss with the independent auditors any disclosed relationships or services that may impact the objectivity or independence of the independent auditors.

• Review and evaluate the qualifications, performance and independence of the lead partner of the independent auditors.

• Take into account the opinions of management and the Director of Internal Audit.

• Discuss with management the timing and process for implementing the rotation of the lead audit partner, the concurring partner and any other active audit engagement team partner and consider whether there should be a regular rotation of the audit firm itself.

The Committee shall present its conclusions with respect to the independent auditors to the Board for its information at least annually.

3. To decide whether to appoint and retain and be directly responsible for the compensation and oversight of the work of any registered public accounting firm, other than the independent auditors, engaged by the Company to perform audit, review or attest services for the Company or its consolidated entities.

4. To obtain from the independent auditors in connection with any audit report filed with the SEC, a report relating to the Company's annual audited financial statements describing all critical accounting policies and practices to be used, all alternative treatments within generally accepted accounting principles for policies and practices related to material items that have been discussed with management, ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the independent auditors, and any material written communications between the independent auditors and management, such as any "management" letter or schedule of unadjusted differences.

5. To review and discuss with management and the independent auditors the Company's annual audited financial statements and quarterly financial statements, including the Company's specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" and "Controls and Procedures," and to discuss with the Company's Chief Executive Officer and Chief Financial Officer (a) their certifications to be provided pursuant to Sections 302 and 906 of the 2002 Act, including whether the financial statements fairly present, in all material respects, the financial condition, results of operations and cash flows of the Company as of and for the periods presented and whether any significant deficiencies and material weaknesses exist in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information, or any fraud has occurred, whether or not material, that

involves management or other employees who have a significant role in the Company's internal control over financial reporting and (b) management's report on internal control over financial reporting pursuant to Section 404 of the 2002 Act. The Committee shall discuss, as applicable: (a) major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles, and major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies; (b) analyses prepared by management and/or the independent auditors setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements; and (c) the effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the financial statements of the Company.

6. To discuss with the independent auditors on at least an annual basis the matters required to be discussed by Statement of Accounting Standards No. 61, as it may be modified or supplemented, as well as any problems or difficulties the auditors encountered in the course of the audit work, including any restrictions on the scope of the independent auditors' activities or access to requested information, and any significant disagreements with management. Among the items the Committee will consider discussing with the independent auditors are: any accounting adjustments that were noted or proposed by the independent auditors but were "passed" (as immaterial or otherwise); any communications between the audit team and the independent auditor's national office with respect to auditing or accounting issues presented by the engagement; and any "management" or "internal control" letter issued, or proposed to be issued, by the independent auditors to the Company. The discussion shall also include the responsibilities, budget and staffing of the Company's internal audit function.

7. To discuss with management earnings press releases and to review generally the type and presentation of information to be included in earnings press releases (paying particular attention to any use of "pro forma," or "adjusted" non-GAAP, information).

8. To review generally with management the type and presentation of any financial information and earnings guidance provided to analysts and rating agencies.

9. To review with management and, as appropriate, the independent auditors periodically, normally on at least an annual basis:

• The independent auditors' annual audit scope, risk assessment and plan.

• The form of independent auditors' report on the annual financial statements and matters related to the conduct of the audit under the standards of the Public Company Accounting Oversight Board (United States).

• Comments by the independent auditors on internal controls and significant findings and recommendations resulting from the audit.

10. To discuss with management periodically, normally on at least an annual basis:

• The appointment of the Director of Internal Audit.

11. To discuss with management and the Director of Internal Audit periodically, normally on at least an annual basis:

• The Internal Audit Charter.

• The adequacy of the Company's internal controls.

• The annual internal audit plan, control risk assessment, and significant findings and recommendations and management's responses thereto.

• Internal audit staffing and compensation.

• The internal audit function and responsibilities and any scope restrictions encountered during the execution of internal audit responsibilities.

• Procedures and controls around the firm's major risk management committees and processes in accordance with SEC requirements under the Consolidated Supervised Entities ("CSE") framework.

12. To review the procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, and for the confidential, anonymous submission by Company employees of concerns regarding questionable accounting or auditing matters, and to assess compliance with these procedures.

13. To review the policies governing the hiring by the Company of any current or former employee of the Company's independent auditors, and to assess compliance with these policies. These policies provide, among other things, that no former employee of the independent auditors who was a member of the Company's audit engagement team may undertake a financial reporting oversight role at the Company within one year of the date of the commencement of procedures for a review or audit.

14. To discuss with management periodically management's assessment of the Company's market, credit, liquidity and other financial and operational risks, and the guidelines, policies and processes for managing such risks.

15. To review and monitor the adequacy of the structures, policies and procedures that the Company has developed to assure the integrity of its investment research, including compliance with the requirements of Sections I.3 and I.5 of Addendum A to the global research settlement to which the Company is a party. As part of this process, the Committee shall meet periodically with the Company's investment research ombudsman, senior management of Global Investment Research and such other individuals within the Company who are charged with overseeing the Company's performance with respect to the investment research area as the Committee may determine.

16. To discuss with one of the Company's General Counsel and/or Chief Compliance Officer any significant legal, compliance or regulatory matters that may have a material impact on the Company's business, financial statements or compliance policies.

17. To obtain assurance from the independent auditors that the audit of the Company's financial statements was conducted in a manner consistent with Section 10A of the Securities Exchange Act of 1934, as amended, which sets forth certain procedures to be followed in any audit of financial statements required under that Act.

18. To produce the report and evaluation described under "Committee Reports" below.

19. To discharge any other duties or responsibilities delegated to the Committee by the Board from time to time.

128.    Pursuant to its Charter, the Compensation Committee had the following duties and

responsibilities:

1. In consultation with senior management, to make recommendations to the Board as to the Company's general compensation philosophy and to oversee the development and implementation of compensation programs.

2. To review and approve those corporate goals and objectives established by the Board that are relevant to the compensation of the CEO, evaluate the performance of the CEO in light of those goals and objectives, and determine and approve the CEO's compensation level based on this evaluation. As part of this evaluation, the Committee shall consider the evaluation of the CEO conducted by the Corporate

Governance and Nominating Committee. In determining the long-term incentive component of CEO compensation, the Committee shall consider, among other factors, the Company's performance and relative shareholder return, the value of similar incentive awards to chief executive officers at the Company's principal competitors and other comparable companies, and the awards given to the CEO in past years.

3. To review and approve the annual compensation of the Company's executives and any new compensation programs applicable to such executives, to make recommendations to the Board with respect to the Company's incentive compensation and equity-based plans that are subject to Board approval, including the Amended and Restated Stock Incentive Plan, the Partner Compensation Plan and the Restricted Partner Compensation Plan, to oversee the activities of the individuals and committees responsible for administering these plans, and to discharge any responsibilities imposed on the Committee by these plans.

4. To review periodically, as it deems appropriate:

• benefits and perquisites provided to the Company's executives; and

• employment agreements, severance arrangements and change in control agreements and provisions relating to the Company's executives.

5. To review annually the application of the compensation process to the Company's investment research professionals and assess whether that process remains consistent with the Company's Investment Research Principles and the requirements of Section I.5 of Addendum A to the global research settlement to which the Company is a party.

6. To review the Company's policies on the tax deductibility of compensation paid to "covered employees" (as defined by Section 162(m)), and, as and when required, to administer plans, establish performance goals and certify that performance goals have been attained for purposes of Section 162(m).

7. To discuss with management periodically, as it deems appropriate:

• reports from management regarding the development, implementation and effectiveness of the Company's policies and strategies relating to its human capital management function, including but not limited to those policies and strategies regarding recruiting, retention, career development and progression, management succession (other than that within the purview of the Corporate Governance and Nominating Committee), diversity and employment practices;

• reports from management relating to compensation guarantees; and

• reports from management regarding the Company's regulatory compliance with respect to compensation matters.

8. To prepare and issue the report and evaluation required under "Committee Reports" below.

9. To discharge any other duties or responsibilities delegated to the Committee by the Board from time to time.

10. To retain at least one compensation consulting firm that is independent and provides services solely to the Committee and not to the Company.

11. To review annually:

• the fees paid by the Company to compensation consultants retained by the Committee in the prior fiscal year;

• the estimated fees to be paid by the Company to compensation consultants retained by the Committee in the current fiscal year; and

• a general description of the services provided by each of the compensation consultants retained by the Committee.

129.    Pursuant to its Charter, the Corporate Governance and Nominating Committee had

the following duties and responsibilities:

1. To identify individuals qualified to become Board members, to recommend to the Board the nominees to stand for election as directors at the annual meeting of stockholders or, if applicable, at a special meeting of stockholders, and in each case to provide to the Board the Committee's assessment of whether each such individual or nominee would be an Independent Director. In the case of a vacancy in the office of a director (including a vacancy created by an increase in the size of the Board), the Committee shall recommend to the Board an individual to fill such vacancy through appointment by the Board. In recommending candidates, the Committee shall place primary emphasis on the criteria set forth under "Selection of Directors – Nominations and Appointments" in the Company's Corporate Governance Guidelines. The Committee may consider candidates proposed by management, but is not required to do so.

2. To review periodically as it deems appropriate, but at least annually, the standards to be applied by the Board in making determinations as to whether a director should be deemed an Independent Director, to recommend to the Board any modifications to these standards that the Committee deems desirable, and to provide to the Board the Committee's assessment of which directors should be

deemed Independent Directors under the then-current standards and under any recommended modifications to the standards.

3. To identify Board members qualified to fill vacancies on any committee of the Board (including the Committee), to recommend that the Board appoint the identified member or members to the respective committee and to recommend to the Board any member of a committee that should be removed from such committee. In recommending a candidate for committee membership or removal from a committee, the Committee shall take into consideration the criteria set forth under "Selection of Directors – Nominations and Appointments" in the Company's Corporate Governance Guidelines, the factors set forth in the charter of the committee, if any, and any other factors that it deems appropriate and that are not inconsistent with the criteria set forth in the Corporate Governance Guidelines or any factors set forth in the committee charter. In recommending a candidate for Audit Committee membership, the Committee shall provide to the Board the Committee's assessment of whether such candidate would be independent and would be an "audit committee financial expert," in each case, as defined by the rules of the Securities and Exchange Commission.

4. To review the continuation on the Board of any director who has tendered a letter of proposed retirement or resignation from the Board and, in the case of a retirement or resignation tendered other than pursuant to Section 2.2 of the Company's By-Laws, to recommend to the Board whether, in light of all the circumstances, the Board should accept such proposed retirement or resignation or request that the director continue to serve or, in the case of a resignation required to be tendered pursuant to Section 2.2 of the Company's By-Laws, to assess whether a significant reason for the director to remain as a director exists and recommend to the Board whether, in light of the existence or absence of such reason, the Board should accept such proposed resignation.

5. To make recommendations to the Board from time to time as to changes that the Committee believes to be desirable in the size of the Board or any committee thereof.

6. To make recommendations to the Board from time to time as to the establishment of any new committees of the Board that the Committee believes to be necessary or desirable.

7. To annually conduct an evaluation of the performance of the Board and, through its chairperson, to communicate this evaluation to the full Board. The performance evaluation shall be conducted in such manner as the Committee deems appropriate.

8. To review periodically the form and amounts of director compensation and make recommendations to the Board with respect thereto.

9. To annually conduct an evaluation of the performance of the CEO and, through its chairperson, to communicate this evaluation to the CEO and the chairperson of the Compensation Committee. The performance evaluation shall be conducted in such manner as the Committee deems appropriate.

10. To review and concur in the CEO's and other senior management's succession plans at least annually.

11. To develop and recommend to the Board a set of corporate governance principles and practices applicable to the Company and, at least once a year, to review those principles and practices and recommend to the Board any revisions the Committee deems necessary or desirable.

12. To review, at least once a year, the Company's Code of Business Conduct and Ethics and recommend to the Board any revisions the Committee deems necessary or desirable.

13. To prepare and issue the report and evaluation required under "Committee Reports" below.

14. To discharge any other duties or responsibilities delegated to the Committee by the Board from time to time.

130.    Finally, Defendants were responsible for maintaining and establishing adequate internal accounting controls for the Company and to ensure that the Company's financial statements were based on accurate financial information. According to Generally Accepted Accounting Principles ("GAAP"), to accomplish the objectives of accurately recording, processing, summarizing, and reporting financial data, a corporation must establish an internal accounting control structure. Among other things, this required Defendants to: (a) make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and (b) devise and maintain a system of internal accounting controls sufficient to provide reasonable assurance that: (i) transactions are executed in accordance with management's general or specific authorization; and (ii) transactions are recorded as necessary to permit preparation of financial statements in conformity with GAAP.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

131.    At all relevant times, as a result of their membership in the Board, various Committees of the Board, and/or senior management of the Company, as well as the powers available to each of them as a result of these memberships, the Defendants each had access to internal corporate documents, conversations, and connections with other corporate officers and employees, attended management and Board meetings, and committees thereof, and was provided with reports and other information about the Company prior to their public dissemination.

132.    Accordingly, and because of their positions of trust, loyalty, and fidelity to Goldman Sachs, Defendants knew or should have known: (a) the adverse, material information about the business of Goldman Sachs that they failed to disclose to the investing public, which subjected the Company to lawsuits by and ultimately huge damages paid to shareholders; (b) the true state of affairs at Goldman Sachs as to which they caused the Company to affirmatively offer false and misleading guidance to investors (including the dissemination of false press releases and false filings with the SEC throughout the Relevant Period; (c) the nature of their fiduciary duties to Goldman Sachs, including the elaborate, duties that the Company required of them, and their active breach of those very same duties; (d) the absence of any meaningful internal controls and procedures that would have prevented the Defendants' manipulation of the market for ARS, their deception of its own customers, and the Company's resulting exposure to government investigations, lawsuits, and the need to repurchase or otherwise carry tens of billions of dollars of essentially worthless ARS on its books; (e) the waste of Company assets represented by Goldman Sachs's decision to pay Defendants lavish salaries, bonuses, and other compensation even though they had exposed the Company to tens of billions of dollars in settlements, ARS repurchases, and other liabilities; and (f)

the conflicts of interests among themselves which caused Defendants to act in their own self-interest and contrary to the interests of Goldman Sachs.

133.    At all relevant times, the Defendants individually and collectively engaged in a course of conduct that was consciously designed to and did: (a) enhance the Defendants' directorial and managerial positions at Goldman Sachs, as well as the power and prestige accruing to Defendants as a result of holding those positions, and transfer exorbitant unearned and wasteful sums of money to themselves; (b) expose Goldman Sachs to liability for Defendants' conscious manipulation of the ARS market, their deception of Company customers, and their exposure of the Company to government investigations, lawsuits, and the need to repurchase or otherwise carry tens of billions of dollars of essentially worthless ARS on its books; (c) conceal the fact that the Company was grossly misrepresenting its financial results in order to allow Defendants to conceal the Company's liability arising from the manipulation of the ARS market at least long enough to allow certain Defendants to pay themselves enormous bonuses for 2007, and all Defendants' substantial bonuses and other compensation; and (d) otherwise deceive the investing public, including Goldman Sachs's own shareholders, as to the Defendants' management of Goldman Sachs's operations, the Company's financial health, stability, the accuracy and integrity of its accounting policies and other internal controls, and its business prospects, exposing the Company to massive damages and incalculable reputational loss among its actual and potential customers and investors.

134.    In committing the wrongful acts alleged herein, Defendants pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to the wrongful conduct herein

alleged as giving rise to primary liability, Defendants further aided, abetted, and/or assisted one another in breaching their respective duties.

135.   At all relevant times, each of the Defendants was the agent of each of the other Defendants, and was at all times acting within the course and scope of such agency.

136.   Each of the Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of the wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

137.   Defendants engaged in a conspiracy, common enterprise and/or common course of conduct commencing on June 20, 2007 and continuing thereafter regarding the ARS market, as well as the Company's financial statements and other statements regarding Goldman Sachs's performance and financial condition. During this time, Defendants caused Goldman Sachs to conceal the true fact that defendants had caused the Company to misrepresent its financial results, deceive customers and shareholders, manipulate the ARS market, and expose the Company to government investigations, lawsuits, and the need to repurchase or otherwise carry tens of billions of dollars of essentially worthless ARS on its books. In addition, Defendants also made specific, improper statements about Goldman Sachs's financial performance, and its future business prospects throughout the Relevant Period.

138.   The purpose and effect of Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise Defendants' violations of federal and state law, breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate

assets and unjust enrichment; to conceal adverse information concerning the Company's operations, financial condition and future business prospects; and to artificially inflate the price of Goldman Sachs common stock so they could, among other things: (i) usurp tens of millions of dollars in unearned bonus, salaries, stock awards, and other emoluments, and (ii) protect and enhance defendants' executive and directorial positions and the substantial compensation and prestige they obtained as a result thereof.

## CLAIMS FOR RELIEF

### COUNT I

#### Against All Defendants for Breach of Fiduciary Duties

139.    The Retirement System incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

140.    Defendants owed and owe Goldman Sachs fiduciary obligations.  By reason of their fiduciary relationships, the Officer Defendants and the Director Defendants owed and owe Goldman Sachs the highest obligation of good faith, fair dealing, loyalty, oversight, and due care.

141.    Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.  Each of the Defendants had actual or constructive knowledge that Defendants had caused the Company to manipulate the market for ARS, deceive its own customers, become exposed to government investigations, lawsuits, and the need to repurchase or otherwise carry tens of billions of dollars of essentially worthless ARS on its books, and mislead shareholders.

142.     Defendants consciously failed to implement an effective system of internal controls over its ARS marketing and trading operations and/or consciously failed to oversee the operations of such control systems.

143.     Defendants knowingly caused or allowed the Company's financial statements to be materially misstated due to Defendants' knowing pretense that the market for ARS was liquid.

144.     Defendants failed in good faith to supervise, and to exert internal controls over, and consciously disregarded responsibilities involving the Company's trading and marketing operations of ARS securities.

145.     Defendants also knowingly caused Goldman Sachs's financial statements during the Relevant Period to be materially misleading and not prepared in accordance with GAAP principles.

146.     As a direct and proximate result of Defendants' failure to perform their fiduciary obligations, Goldman Sachs has sustained significant damages. As a result of the misconduct alleged herein, each of the Defendants is liable to the Company.

147.     The Retirement System on behalf of Goldman Sachs has no adequate remedy at law.

## COUNT II

### Against the Insider Selling Defendants for Breach of Fiduciary Duties

148.     The Retirement System incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

149.     At the time of each of the stock sales set forth herein, each of the Insider Selling Defendants knew, but did not disclose publicly, the material information described herein. Each of the Insider Selling Defendants made each of his or her sales of stock between June 20, 2007 and the present on the basis of and because of his or her knowledge of this material, non-public information.

150.   At the time of their stock sales, each of the Insider Selling Defendants knew that when the material information described herein was publicly disclosed, the price of the Company's stock would dramatically decrease. These defendants' sales of Goldman Sachs common stock based on their knowledge of the material, non-public information was a breach of their fiduciary duties of loyalty and good faith.

151.   As a result of this misconduct, the Insider Selling Defendants are liable to the Company. The Company is entitled to have a constructive trust imposed on any proceeds obtained by these defendants obtained thereby.

152.   The Retirement System on behalf of Goldman Sachs has no adequate remedy at law.

### COUNT III

### Against All Defendants for Abuse of Control

153.   The Retirement System incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

154.   Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Goldman Sachs, for which they are legally responsible. Among these abuses of control were:

(a)   Defendants' failure to in good faith supervise and exert internal controls over, and their conscious disregard of responsibilities involving the Company's operations in the trading and marketing of ARS securities, and their knowing failure to disclose the true accounting, operational and financial condition of the Company;

(b)   Defendants' knowingly causing or allowing Goldman Sachs to prepare and publish financial statements that were materially misstated due to defendants'

concealment of the illiquid market for ARS and the Company's exposure to government investigations, lawsuits, and the need to repurchase or otherwise carry tens of billions of dollars of essentially worthless ARS on its books; and

(c)    Defendants' knowingly causing, allowing and/or arranging the payment of tens of millions of dollars more in improper salaries, bonuses, and other compensation – and to award themselves lucrative new compensation packages – at a time when, as a direct and foreseeable consequence of their wrongdoing, the Company was exposed to tens of billions of dollars in losses;

155.    As a direct and proximate result of Defendants' abuse of control, Goldman Sachs has sustained significant damages.

156.    As a result of the misconduct alleged herein, Defendants are liable to the Company.

157.    The Retirement System on behalf of Goldman Sachs has no adequate remedy at law.

### COUNT IV

### Against All Defendants for Gross Mismanagement

158.    The Retirement System incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

159.    By their actions alleged herein, Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Goldman Sachs in a manner consistent with the operations of a publicly held corporation.

160.    Defendants caused or allowed Goldman Sachs to lack requisite internal controls, and as a result, the Company's projections and reported results were based upon defective assumptions and/or manipulated facts.

161.    Defendants caused or allowed the Company's financial statements to be materially misstated due to Defendants' knowing failure to prevent Goldman Sachs's manipulation of the market for ARS, its deception of its own customers, and its resulting exposure to government investigations, lawsuits, and the need to repurchase or otherwise carry tens of billions of dollars of essentially worthless ARS on its books.

162.    Based on the foregoing, Defendants caused or allowed Goldman Sachs's financial statements to be materially misleading and not prepared in accordance with GAAP principles during the Relevant Period.

163.    As a direct and proximate result of Defendants' gross mismanagement and breaches of fiduciary duty alleged herein, Goldman Sachs has sustained significant damages in excess of hundreds of millions of dollars. In fact, Goldman Sachs's market capitalization was reduced by *tens of billions of dollars* during the Relevant Period and especially during the last few months alone.

164.    As a result of the misconduct and breaches of duty alleged herein, Defendants are liable to the Company.

165.    The Retirement System on behalf of Goldman Sachs has no adequate remedy at law.

## COUNT V

### Derivatively Against All Defendants for Violation of § 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder

166.    The Retirement System incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

167.    Throughout the Relevant Period, Defendants, by the use of means or instrumentalities of interstate commerce, the United States mails, interstate telephone communications, and a national securities exchange, employed a device, scheme, or artifice to defraud, made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading, and engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the Company and shareholders in connection with their purchases of Goldman Sachs during the Relevant Period, all in violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

168.    Defendants, as the most senior officers and/or members of the Board of Directors of Goldman Sachs and various Committees of the Board during the Relevant Period, are liable as direct participants in all of the wrongs complained of herein. Through their positions of control and authority, Defendants were in a position to and did control all of the false and misleading statements and omissions made on behalf of the Company, including the contents of all its public filings and reports and press releases, as more particularly set forth above. In addition, certain of these false and misleading statements constitute "group published information," which Defendants were responsible for creating.

169.    Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them and they had express responsibility for knowing such facts. Such material misrepresentations and omissions were made knowingly or recklessly and for the purpose and effect of concealing the Company's true financial and operating condition from shareholders and supporting an artificially inflated price of the Company's common stock.

170.    Defendants had the motive and opportunity to commit fraud. By virtue of their positions of control over the entire management of the Company, the Director Defendants had unquestioned opportunity to issue statements that they knew were false and misleading. Each of the Officer Defendants had direct operative control over the Company's practices in the ARS market. Each of the Defendants had the motive to mislead investors as to the Company's true exposure to these instruments, because, among other things:

(a)     During the Relevant Period, each of the Officer Defendants wanted to paint a picture of Goldman Sachs as being as profitable as possible so as to ensure the maximum possible bonus and other performance-based compensation for the fiscal year; accordingly, each of these Defendants was motivated to conceal the Company's true exposure to losses in the ARS market;

(b)     In particular, each of the Officer Defendants received significant compensation including a program of bonuses when Goldman Sachs reached certain financial and earnings targets. The target bonuses rewarded executives on a variety of factors, including the profitability of the Company's operations in the trading and marketing

of ARS. The Officer Defendants, therefore, understood that announcing that Goldman Sachs stood to lose billions of dollars from revelation that the ARS market was not liquid, and that the Company had manipulated the market to deceive its own customers on that topic, would directly and negatively impact their bonuses;

      (c)    Defendants further benefited from high stock prices for Goldman Sachs when they sold the stock they received through stock, option, and other awards. As set forth *supra*, since June 20, 2007, Defendants sold millions of dollars worth of Company stock. If Defendants had caused the Company to report losses in a timely manner, the stock price would have fallen and the amount of money Defendants received from their stock price correspondingly would have decreased by 50 percent or more;

      (d)    In addition, each of the Defendants, by virtue of being a shareholder of Goldman Sachs, was motivated to conceal the Company's exposure to losses and other liabilities in the ARS market as a result of the illiquidity of that market and Defendants' manipulation thereof so as to maintain an artificially high price for the Company's stock;

      (e)    Defendants were motivated to overstate Goldman Sachs's financial results, and keep its stock price high, so as to protect their positions of power, authority, prestige, and personal remuneration at the Company, including out-sized salaries, directors' fees, stock awards, and other emoluments worth multiple millions of dollars to each Defendant and to some, *hundreds of millions of dollars*; and

      (f)    Defendants, as a result of the SEC administrative proceeding, were on notice no later than May 2006 that their practices in the market for ARS securities were fraudulent

and manipulative, yet did not take steps to change them, preferring instead to retain the profits from such illegal market manipulation.

171.    Defendants Blankfein and Viniar signed certifications to each of the Forms 10-Q and 10-K filed publicly with the SEC during the Relevant Period, attesting that they had reviewed the reports and based on their knowledge, there were no untrue statements of material fact or omissions of material fact necessary to make the statement made, in light of the circumstances under which the statements were made, not misleading.

172.    The Company repurchased shares of its common stock during the Relevant Period. In purchasing its stock, the Company or its shareholders relied upon the Defendants' statements and/or the integrity of the market in making their purchases.

173.    Accordingly, Defendants violated § 10(b) of the Exchange Act and Rule 10b-5 thereunder in that they:

(a)    employed devices, schemes and artifices to defraud;

(b)    made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

(c)    engaged in acts, practices and a course of business that operated as a fraud or deceit upon Goldman Sachs and others in connection with their purchases of Goldman Sachs common stock during the Relevant Period.

174.    As a result of Defendants' misconduct, Goldman Sachs has suffered and will suffer damages in that it paid artificially inflated prices for Goldman Sachs common stock purchased on the open market. Goldman Sachs would not have purchased Goldman Sachs common stock at the prices

it paid had the market been aware that the market price of Goldman Sachs's stock was artificially and falsely inflated by Defendants' misleading statements.  As a direct and proximate result of Defendants' wrongful conduct, Goldman Sachs suffered damages in connection with its purchases of Goldman Sachs common stock during the relevant period.  By reason of such conduct, Defendants are liable to the Company.

175.    The Retirement System on behalf of Goldman Sachs has no adequate remedy at law.

### PRAYER FOR RELIEF

**WHEREFORE**, the Retirement System demands judgment as follows:

A.    Against all Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment, and violations of federal law;

B.    Extraordinary equitable and/or injunctive relief as permitted by law, equity and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on or otherwise restricting Defendants' assets until the Company can recoup all of the monies improperly transferred to Defendants, and the proceeds to the Insider Selling Defendants from their sales of Company common stock based on material, non-public information, so as to assure that the Retirement System on behalf of Goldman Sachs has an effective remedy;

C.    Declaring that the Defendants are liable under of § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and awarding Goldman Sachs damages;

D.    Declaring that Defendants' improper payments to themselves through the Company's coffers of unearned bonuses, compensation, stock awards, fees, and other illicit transfers

-- as well as any assets or property acquired with such payments -- be held in constructive trust for the Company's benefit;

     E.     Awarding to Goldman Sachs restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other monies obtained by Defendants;

     F.     Directing Goldman Sachs to take all necessary actions to reform and improve their corporate governance and internal procedures to comply with applicable laws and to protect Goldman Sachs and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote the following Corporate Governance Policies:

     (i)     strengthening the Board's supervision of operations in the issuance, sales, marketing, trading, and redemption of ARS and developing and implementing procedures for greater shareholder input into the policies and guidelines of the Board;

     (ii)     controlling and limiting improper payments of unearned compensation, corporate benefits, stock awards, and other emoluments;

     (iii)     permitting shareholders of Goldman Sachs to nominate at least three candidates for election to the Board;

     (iv)     appropriately testing and then strengthening the internal audit and control functions demanded herein;

     (v)     replacing and reforming the membership of the Audit Committee, the Compensation Committee, and the Corporate Governance and Nominating Committee;

(vi)     establishing a Committee of the Board charged with monitoring and minimizing the risk to the Company from its activities in various types of derivative securities, such as ARS, whose volatility or liquidity might create financial issues for the Company, its trading partners, or its customers, or damage its reputation;

(vii)    preventing the Company from underwriting or selling any new derivative securities without adequate safeguards that such securities will trade in a liquid market without the need for supportive or manipulative activities by the Company that violate Company policies, ethical norms, industry standards, or federal or state securities laws; and

(viii)   establishing a Board-level committee to analyze and control risk to the Company from the issuance, marketing, sales, trading, and investment in ARS and similar securities, and to prevent similar manipulative schemes from recurring.

G.       Awarding the Retirement System the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses;

H.       Granting such other and further relief as the Court deems just and proper

## JURY DEMAND

The Retirement System demands a trial by jury.

Dated: August 26, 2008

KAHN GAUTHIER SWICK, LLC

Lewis S. Kahn
Albert M. Myers (AM-2750)
Kevin Oufnac
650 Poydras Street, Suite 2150
New Orleans, LA 70130
Telephone: (504) 455-1400
Facsimile: (504) 455-1498

Michael Swick (MS-9970)
12 East 41st Street—12th Floor
New York, NY 10017
Telephone: (212) 696-3730
Facsimile: (504) 455-1498

*Attorneys for Plaintiff the Louisiana Municipal Employees Retirement System*

AUG. 26. 2008  1:13PM    MUNICIPAL POLICE                              NO. 8755   P. 1

## VERIFICATION

I, Kathy Bourque, am the Director of the Louisiana Municipal Police Employees'
Retirement System (MPERS). I declare that I have reviewed the Shareholder's Derivative
Complaint in the case captioned *Louisiana Municipal Police Employees' Retirement System v.
Lloyd C. Blankfein, et. al.*, S.D.N.Y., and I authorize its filing. I have reviewed the allegations
made in the Complaint, and to those allegations of which I have personal knowledge, I believe
those allegations to be true. As to those allegations of which I do not have personal knowledge, I
rely on my counsel and their investigation and for that reason I believe them to be true. I further
declare that MPERS is a current owner of Goldman Sachs Group, Inc. common stock and has
been an owner of such stock from at least January 2006 to the present.

August 26 , 2008.

Kathy Bourque
Director, Louisiana Municipal Police Employee's
Retirement System
7722 Office Park Blvd., Suite 200
Baton Rouge, LA 70809