UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

LOUISIANA MUNICIPAL POLICE EMPLOYEES
RETIREMENT SYSTEM,

                                            Plaintiff,

                v.

LLOYD C. BLANKFEIN, JOHN WINKELRIED,
GARY D. COHN, JOHN H. BRYAN, CLAES
DAHLBACK, STEPHEN FRIEDMAN, WILLIAM W.
GEORGE, RAJAT K. GUPTA, JAMES A. JOHNSON,
LOIS D. JULIBER, EDWARD M. LIDDY, RUTH
J. SIMMONS, LAKSHMI N. MITTAL, DAVID A.
VINIAR, and ALLAN M. COHEN,

                                            Defendants.

**MEMORANDUM &
ORDER**

No. 08 Civ. 7605 (LBS)

---

SAND, J.,

      Plaintiff Louisiana Municipal Police Employees Retirement System brings this derivative action on behalf of Goldman Sachs Group, Inc. ("Goldman Sachs" or the "Company"), a Delaware corporation traded on the New York Stock Exchange ("NYSE").[1] At the time that the Complaint was filed, Goldman Sachs' Board of Directors consisted of thirteen individuals, each of whom is named as a Defendant. Three directors, Messrs. Blankfein, Winkelried, and Cohn, also serve as Goldman Sachs executives. The remaining ten directors ("Outside Directors") are not employees of Goldman Sachs. The Complaint also names as Defendants the Company's Chief Financial Officer and its Chief Compliance Officer, Messrs. Viniar and Cohen, neither of whom sits on the Company's Board.

---

[1] Goldman Sachs is a leading global investment banking, securities and investment management firm that provides a wide range of service worldwide to a diversified client base.

1

Plaintiff alleges that Defendants, either actively or passively, participated in an industry-wide securities market manipulation scheme for auction-rate securities ("ARS").[2] Plaintiff thus brings five causes of action on behalf of Goldman Sachs. Plaintiff alleges that each Defendant breached his or her fiduciary duties by having actual or constructive knowledge that the Company was manipulating the market for ARS and failing to provide adequate oversight over this conduct (Count I). Similar allegations underpin the abuse of control and gross mismanagement claims against Defendants (Count III, IV). Plaintiff further alleges that certain Defendants personally sold Goldman Sachs stock in the open market while in possession of material, non-public information, and seeks a constructive trust on the proceeds of those sales under Delaware law (Count II). Finally, Plaintiff claims that the Company was defrauded under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, when the Company repurchased its own stock at allegedly artificially inflated prices (Count V).

Defendants move to dismiss arguing, inter alia, that Plaintiff has failed to make a pre-suit demand that the Goldman Sachs Board of Directors, itself, bring this suit on behalf of the Company. Plaintiff concedes that it did not make a demand on the Board. However, Plaintiff argues that any such demand would have been futile, and is therefore excusable, because a majority of the Company's directors lack independence and are not disinterested. For the reasons set forth below, the Court finds that a demand of the Company's Board was not futile

---

[2] As described in the Complaint, ARS are securities that pay an interest rate or dividend which is periodically reset by an auction process. During an ARS auction, investors submit bids to an "auction agent" setting forth the rate of return the investor would be willing to accept. If sufficient bids to purchase all the ARS for sale in a given auction are received, the "clearing rate" is set at the rate sufficient to satisfy all bidders, and the successful bidders receive the clearing rate until the next auction. An auction "fails" in whole or in part if an inadequate number of bids are received in an auction, in which case the issuer pays a rate of return specified in the offering documents until its next successful auction.

2

and thus dismisses Plaintiff's action for failure to satisfy the demand requirement, which is a precondition for bringing this action.

I.      **Background**

The Complaint alleges that Defendants were involved in a scheme to manipulate the ARS market by, among other things, failing to provide adequate oversight and halt allegedly illegal and improper trading practices.  Defendants are specifically accused of permitting improper misrepresentations regarding the health and liquidity of the ARS market.  (Compl. ¶¶ 78, 79.) Plaintiff alleges that Defendants permitted this to occur in the face of several red flags concerning the potential for misconduct in regards to the ARS market as well as deterioration in the ARS market in 2007.

As the basis for its assertion that Defendants ignored red flags, Plaintiff contends that during the period of 2007–2008, Defendants should have had heightened awareness of potential impropriety connected to the ARS market because of a cease and desist proceeding brought by the SEC in 2006.  The 2006 SEC proceeding (2006 Proceeding) concerned allegations that Goldman Sachs encouraged illegal trading practices in the ARS market—specifically, insufficient dealer disclosure of actions designed to create the appearance that auctions were successful and legitimate when, in fact, they were neither.  (Compl. ¶¶ 66–72.)  Goldman Sachs allegedly agreed to pay a large fine as part of a settlement and was censured and ordered to cease and desist from the improper practices (2006 Settlement).  (Compl. ¶ 73.)  Plaintiff argues that the 2006 Proceeding and Settlement put Defendants on notice of the potential for manipulative conduct in connection with the ARS market by Goldman Sachs' employees and thus heightened the Defendants' obligation to be alert to any misconduct in the future.

Plaintiff also alleges that Defendants ignored several other red flags. Plaintiff alleges that in 2007, Defendants knew that the tightening of the credit market would lead to a collapse in demand for ARS and yet permitted representations that the ARS market was healthy and particularly liquid, and accordingly that ARS would be a good investment for investors with cash-equivalent needs. (Compl. ¶¶ 63–65, 75–79.) Plaintiff further alleges that Defendants continued to increase the intensity of its marketing of ARS throughout 2007 despite the consistent failures of monthly auctions beginning in August 2007. (Compl. ¶¶ 79–84.) Plaintiff additionally alleges that Defendants permitted this representation despite the decision of the Financial Accounting Standards Board in March 2007 to require that ARS be listed on investors' balance sheets as "short-term investments" rather than "cash equivalents." (Compl. ¶ 77.) This event allegedly caused Goldman Sachs to retain more ARS inventory than it could financially handle because its corporate investors began to dispose of their ARS upon learning that the ARS were less liquid than they had previously thought, in an effort to avoid a decline in their liquidity ratings. (Compl. ¶ 77.)

Plaintiff alleges that in February 2008, Goldman Sachs realized that it could no longer maintain the illusion of a healthy ARS market and accordingly stopped supporting auctions altogether and simply walked away from the ARS market. (Compl. ¶ 83.) As a result, Plaintiff alleges that Goldman was charged with violations of federal and state securities laws in 2008. Goldman Sachs agreed to a settlement in 2008 with state agencies (2008 Settlement) that included, among other things, a repurchasing of ARS from Goldman Sach's high net-worth customers and a payment of a $22.5 million fine, although Goldman Sachs never explicitly

admitted to any wrongdoing.[3]  (Compl. ¶¶ 85–92.)  Plaintiff alleges that the misconduct that resulted in the 2008 Settlement was a result of Defendants' failure to exercise proper oversight.

## II.     Discussion

Plaintiff brings this case as a derivative action on behalf Goldman Sachs.  It is a "cardinal precept" of Delaware law that boards of directors, not shareholders, manage the business and affairs of corporations.[4]  *Aronson*, 473 A.2d at 811.  The decision to bring a lawsuit on behalf of a corporation, or to refrain therefrom, is a decision properly placed in the hands of the corporation's board.  *Spiegel* v. *Buntrock*, 571 A.2d 767, 773 (Del. 1990).  Thus, when a corporation might possess a legal claim, "it is the corporation, acting through its board of directors, which must make the decision whether or not to assert the claim."  *Grimes v. Donald*, 673 A.2d 1207, 1215 (Del. 1996).

Because a "derivative action impinges on the managerial freedom of directors," a stockholder may not pursue a derivative action on behalf of the corporation unless the stockholder: (a) has first demanded that the directors pursue the corporate claim and the directors have wrongfully refused to do so; or (b) establishes that pre-suit demand is excused because the directors are deemed incapable of making an impartial decision regarding the pursuit of the litigation.  *Wood v. Baum*, 953 A.2d 136, 140 (Del. 2008); *see also Kamen*, 500 U.S. at 101; *Ross v. Bernhard*, 396 U.S. 531, 534 (1970); *e.g.*, Fed. R. Civ. P. 23.1.  A shareholder can meet this second requirement—demand futility— by establishing that there is a reasonable doubt that (1) the challenged transaction was otherwise the product of a valid exercise of business judgment

---

[3] The SEC's investigation of Goldman Sachs is ongoing; the parties have not yet come to a settlement agreement. (Compl. ¶ 91.)

[4] The Complaint is comprised of Delaware state law claims and federal securities claims.  In assessing whether a pleading is adequate for a derivative action under Fed. R. Civ. P. 23.1, courts apply the law of the state of incorporation of the defendant corporation, which in this case is Delaware (Compl. ¶ 20).  *See Kamen* v. *Kemper Fin. Servs.*, 500 U.S. 90, 98–99 (1991); *Scalisi v. Fund Asset Mgmt., L.P.*, 380 F.3d 133, 138 (2d Cir. 2004) (substantive law governing demand futility "is provided by the state of incorporation").

and (2) the directors are disinterested and independent. *Aronson*, 473 A.2d at 814. If a derivative plaintiff fails to make demand, the directors "are entitled to a presumption that they were faithful to their fiduciary duties [and] the burden is upon the [derivative] plaintiff . . . to overcome that presumption." *Beam v. Stewart*, 845 A.2d 1040, 1048–49 (Del. 2004) (emphasis omitted).[5]

It is uncontested that Plaintiff failed to make demand in this case. Moreover, upon reviewing the pleadings, the Court finds that the Complaint fails to establish a reasonable doubt as to the Defendants' independence or the business judgment exercised by Defendants. Defendants' motion to dismiss is thus granted.

    A. <u>Business Judgment</u>

One way a plaintiff can traditionally establish demand futility is by challenging whether the directors have acted in conformity with the business judgment rule in approving the challenged transaction. *Rales v. Blasband*, 634 A.2d 927, 933 (Del. 1993); *Aronson*, 473 A.2d at 813. However, where a claim is based on board inaction, the absence of a challenged transaction makes it impossible to perform the traditional analysis. *Rales*, 634 A.2d at 933. Instead, to show demand futility where the subject of a derivative suit is a violation of a board's oversight duties, a plaintiff must allege particularized facts that "create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and

---

[5] Regardless of this presumption, in deciding Plaintiff's motion to dismiss the Court accepts as true all well-pleaded factual allegations and draws all reasonable inferences in the plaintiff's favor. *Levy v. Southbrook Int'l Invs., Ltd.*, 263 F.3d 10, 14 (2d Cir. 2001). However, "a plaintiff's obligation to provide grounds of his entitlement to relief requires more than labels and conclusions." *ATSI Commc'ns Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 127 S.Ct. 1955, 1964–65 (2007)). The plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient "to raise a right to relief above the speculative level." *Id.* In analyzing the allegations in the Complaint, the Court is particularly mindful that to establish that demand is excused, Plaintiff must meet more than a permissive notice pleading standard; the pleadings must set forth "particularized factual statements that are essential to the claim." *Brehm v. Eisner*, 746 A.2d 244, 254 (Del. 2000); *In re Pfizer Inc. Deriv. Sec. Litig.*, 503 F. Supp. 2d 680, 683 (S.D.N.Y. 2007).

disinterested business judgment in responding to a demand." *In re Citigroup Inc. S'holder Deriv. Litig.*, 964 A.2d 106, 120 (Del. Ch. 2009) (internal quotation omitted).

Plaintiff essentially argues that the Board's failure to act in circumstances in which due attention would have prevented losses suffered by the Company was not the product of valid business judgment. *See In re Caremark Int'l Derivative Litig.*, 698 A.2d 959, 967 (Del. Ch. 1996) (discussing how demand futility analysis applies to a shareholder oversight claim). The Complaint alleges that Defendants overlooked several red flags concerning the potential for manipulation of the ARS market in the face of a deteriorating market. Specifically, Plaintiff argues that the SEC's 2006 Proceeding, concerning impropriety connected to the ARS market at Goldman Sachs, was a red flag that should have alerted Defendants to potential improper conduct, such as the underlying conduct in this action. Plaintiff further alleges that the tightening of the credit market in 2007, the failure of auctions in 2007–2008, and the decision of the Financial Accounting Standards Board to require that ARS be listed on investors' balance sheets as "short-term investments" rather than "cash equivalents" were red flags that should have put Defendants on notice that the market for these securities was not as healthy and liquid as Goldman Sachs believed and represented it to be. (Compl. ¶¶ 78, 79.)

The Court finds the case before it to be analogous to the recent *Citigroup* case decided by the Court of Chancery of Delaware. *In re Citigroup Inc. S'holder Deriv. Litig.*, 964 A.2d 106 (Del. Ch. 2009). In *Citigroup*, the court rejected derivative claims that Citigroup's board failed to exercise adequate oversight over its subprime businesses. The plaintiff in *Citigroup* made allegations, similar to the ones in this Complaint, that the defendants breached their fiduciary duties by failing to monitor and manage the risks that the company faced from problems in the

subprime lending market and for failing to provide adequate disclosure of Citigroup's exposure to subprime assets. *Id.* at 111.

After discussing the purpose and breadth of the business judgment rule, the Chancery court analyzed whether the complaint contained particularized allegations raising a doubt that the directors could have properly exercised their business judgment in responding to a demand. *Id.* at 120–21. Citing to the Delaware Court of Chancery's *Caremark* decision, *In re Caremark Int'l Derivative Litig.*, 698 A.2d 959, the court explained that to state a viable lack of oversight claim, a derivative plaintiff must "show director conduct that is so egregious on its face that board approval cannot meet the test of business judgment," *Citigroup*, 964 A.2d at 121 (internal quotation omitted), *i.e.*, a "sustained or systematic failure of the board to exercise oversight" sufficient to establish that the directors acted in "bad faith," *id*. at 122–23 (internal quotation omitted). Noting that Citigroup had "procedures and controls in place that were designed to monitor risk," *id*. at 127, the court found that the alleged red flags concerning the subprime mortgage markets were insufficient because the complaint only alleged that the director defendants made (or allowed to be made) "business decisions that, in hindsight, turned out poorly for the Company," *id*. at 124. The Court finds that the same analysis applies to the relevant red flags alleged in this Complaint.

Unlike the traditional *Caremark* claim in which liability arises from a failure to monitor or oversee appropriately employee misconduct or violations of law, *id.* at 123, the allegations in the Complaint attempt to base liability on a failure to monitor business-risk related to the ARS market. The principal red flags in the Complaint seek to base liability on a failure of the Board to respond correctly to signs that the ARS market was not as healthy and liquid as some employees at Goldman Sachs believed or represented it to be. The essence of the red flags in the

Complaint do not relate to employee misconduct. The relevant red flags in the Complaint address "nothing more than signs of continuing deterioration" in the financial markets. *Id.* at 128. These are exactly the kinds of allegations that the *Citigroup* court found do not state a claim for relief under *Caremark*, as they "are not evidence that the directors consciously disregarded their duties or otherwise acted in bad faith."[6] *Id.*

Plaintiff attempts to distinguish the *Citigroup* opinion by arguing that the *Citigroup* complaint did not allege any advance warning of impropriety. (Tr. Oral Argument, Apr. 2, 2009, at 18.) Plaintiff argues that, in contrast, its Complaint alleges that the 2006 Settlement between the SEC and multiple ARS broker-dealers provided the Board with notice of potential impropriety connected to Goldman Sach's ARS business. (Pl.'s Br. at 12–13.) The Court finds this argument unavailing.

The 2006 Settlement concerned insufficient dealer disclosure of bidding practices designed to create the appearance that auctions were successful and legitimate when, in fact, they were not. However, the Complaint does not make any allegations concerning improper bidding practices or their disclosures.[7] The Complaint instead accuses Goldman Sachs of a different sort of misconduct: improperly "maintain[ing] the illusion of a healthy and liquid market for [ARS]." (Compl. ¶¶ 78, 79.) Accordingly, we conclude that the 2006 Settlement does not constitute a red flag that the credit markets might implode, causing dealers to discontinue supporting auctions to

---

[6] The Court finds the cases cited in Plaintiff's brief to be inapposite. Unlike the allegedly missed signs of market deterioration in this case, plaintiffs in those cases could establish with particularity either conscious inaction by the board or a truly systematic failure to exercise oversight. *E.g.*, *In re Abbott Labs. Deriv. S'holders Litig.*, 325 F.3d 795, 808–09 (7th Cir. 2001) (directors met with government regulators at least ten times to discuss the same violation of law); *McCall* v. *Scott*, 239 F.3d 808, 820 (6th Cir. 2001) (directors ignored audit reports showing "unmistakable signs that improper practices were being employed throughout the corporation"); *In re Countrywide Fin. Corp. Deriv. Litig.*, 554 F. Supp. 2d 1044, 1058–64 (C.D. Cal. 2008) (witness statements that employees knowingly disregarded loan-underwriting standards and allegations demonstrating how directors had access to data revealing severe problems in core business operations); *In re Veeco Instruments, Inc. Sec. Litig.*, 434 F. Supp. 2d 267, 275–78 (S.D.N.Y. 2006) (directors failed to investigate credible and repeated whistleblower complaints).

[7] The Court notes that Plaintiff does not contest Defendants' contention that Goldman Sachs promptly updated its investor disclosures regarding its bidding practices after the 2006 Settlement was executed and is in full compliance with the 2006 Settlement (*see* Def.'s Mot. At 5).

9

avoid ever-increasing capital commitment. *See Citigroup*, 964 A.2d at 129 (Citigroup's and Enron's past misuse of structured investment vehicles did not trigger "any type of heightened notice to the unrelated use of SIVs . . . involving subprime securities."). Because the Complaint does not sufficiently allege any red flags that support the conclusion that Defendants consciously disregarded their duties or otherwise acted in bad faith, we find that Plaintiff's Complaint does not satisfy the business judgment prong of the test for excusing demand.

### B. Director Independence

Plaintiff also argues that its failure to make demand should be excused because its Complaint establishes reasonable doubt that Defendants are disinterested and independent. Under this prong, Plaintiff is required to allege particularized facts showing that a majority of Goldman Sachs' thirteen-member Board are "incapable of making an impartial decision regarding the pursuit of the litigation." *See Wood v. Baum*, 953 A.2d at 140. Upon reviewing Plaintiff's allegations, we find that the Complaint fails to demonstrate that the ten Outside Directors—which would constitute a majority of the Board—are not disinterested for the purpose of entertaining a demand.

Plaintiff challenges the Outside Directors' independence on three principal grounds: (1) the Board is not disinterested because all of its members are subject to suit in this case; (2) donations made by Goldman Sachs (or its independently-run charitable foundation) to charities affiliated with certain directors rendered those directors not disinterested (*see* Compl. ¶¶ 42(g) – (o)); (3) the Board's independence is undermined by the fact that all Board Members, with the exception of one,[8] were members of all three of the Company's Board Committees, including the

---

[8] The single exception is that defendant Simmons does not sit on the audit committee. (Compl. ¶ 42(d) n.1.)

oversight and compensation committees, during the relevant time period (*see* Compl. ¶¶ 126–129).[9]

The principal challenges made by Plaintiff to the independence of the Goldman Sachs Board were recently considered by the Eastern District of New York in *Bader* v. *Blankfein*, No. 07 Civ. 1130, 2008 WL 5274442 (E.D.N.Y. Dec. 19, 2008) (notice of appeal filed Jan. 13, 2009). The director defendants in both cases are identical with one exception. The *Bader* court rejected the contention that a majority of the Goldman Sachs Board lacked independence and thus dismissed the plaintiff's complaint for failure to make pre-suit demand. *See id.* at *9. We agree with the conclusion of the *Bader* court.

As an initial matter, Plaintiff's decision to sue the entire board does not excuse demand. Demand is not excused simply because no director defendant would choose to sue himself or herself, or a fellow director. As the *Bader* court explained when rejecting this line of argument, "Delaware and federal courts alike have long held claims of directorial participation in and liability for the wrongs alleged, coupled with a reluctance by directors to sue themselves, inadequate to establish futility." *Id.* at *8 (internal quotation marks omitted). Allowing Plaintiff to "circumvent the demand requirement merely by naming as defendants all members of the derivative corporation's board" would "eviscerate [Fed. R. Civ. P.] 23.1." *Lewis* v. *Graves*, 701 F.2d 245, 249 (2d Cir. 1983); *accord Grimes* v. *Donald*, 673 A.2d 1207, 1216 n.8 (Del. 1996) (plaintiffs cannot "subvert the particularity requirements" governing derivative actions "simply by designating all the directors as targets").

---

[9] The Court notes that Plaintiff does allege that two of the Outside Directors—Directors Dahlback and Mittal—lack independence because they have significant business relationships with Goldman Sachs beyond their capacity as directors. The Court does not reach this claim as it is moot point; even if it were accepted, demand would nevertheless not be excused as a majority of the board would still be disinterested given that Plaintiff's other claims relating to director independence have been deemed unsuccessful. Similarly, the Court does not address Plaintiff's claims regarding insider selling as the issue was not taken up by the parties in the briefing or argument, as well as because the allegations only run to three of the directors, each of whom is an inside director (Compl. ¶ 107.)

Second, the Court agrees with *Bader* that Plaintiff's allegation concerning the Outside Directors' affiliation with charities to which Goldman Sachs has allegedly made contributions is insufficient to excuse the demand requirement.  It is settled law that charitable contributions do not excuse demand without "many more particularized facts about the materiality of the relationship in question that would create a reasonable doubt about the independence of the directors."  *In re J.P. Morgan Chase & Co. S'holder Litig.*, 906 A.2d 808, 823 n.48 (Del. Ch. 2005), *aff'd*, 906 A.2d 766 (Del. 2006); *see also Bader*, 2008 WL 5274442, at *8–9.  Plaintiff attempts to distinguish *Bader* on this ground by arguing that in *Bader* a Goldman Sachs foundation allegedly made donations to charities affiliated with directors, whereas in this case Goldman Sachs *itself* allegedly made the donations.  (*See* Pl.'s Br. at 21 n.26.)  Plaintiff does not, however, explain the relevance of this distinction in relation to the law on charitable donations in the demand futility context.  Without any allegations regarding the scope or magnitude of the charities, donations, or director affiliations, the Court finds that Plaintiff's donation allegations do not establish lack of independence for the purpose of demand futility.

Third, we find unavailing Plaintiff's arguments concerning the alleged lack of independence based on Defendants' membership in all three of the Company's Board Committees during the relevant time period, including the oversight and compensation committees.  Numerous cases have held that board committee membership, without more, cannot establish demand futility.  *See*, *e.g., Pirelli*, 579 F. Supp. 2d at 532 ("[G]eneral allegations, based simply on the fact that a defendant was a member of a board or committee, without more, are insufficient as a matter of law."); *Ferre*, 2007 WL 1180650, at *6 (rejecting "conclusory allegation that, because these directors were members of [a board] Committee, they 'knew or should have known'" about alleged misconduct); *Halpert Enters., Inc.* v. *Harrison*, 362 F. Supp.

2d 426, 429 (S.D.N.Y. 2005) (same).  The Complaint's lengthy recitation of various Board committee governance principles (Compl. ¶¶ 124–130) merely shows that "there exists a body of rules . . . which may have been violated."  *Rattner* v. *Bidzos*, 2003 WL 22284323, at *13 (Del. Ch. Oct. 7, 2003).  As noted in *Citigroup*, service on an oversight committee does not "change the standard of director liability."  *Citigroup*, 964 A.2d at 128 n.63.

Moreover, the Court rejects Plaintiff's argument that the Goldman Sachs Board cannot entertain a demand because its directors allegedly ignored "red flags"—identified through the benefit of hindsight—and consequently face a serious threat of personal liability based on oversight failures.  "[T]he mere threat of personal liability" is "insufficient to challenge either the independence or disinterestedness of directors" unless a plaintiff pleads particularized facts showing that a majority of directors face "a substantial threat of personal liability."  *Wood*, 953 A.2d at 141 n.11 (internal quotation marks omitted); *Citigroup*, 964 A.2d at 120.  Additionally, where director defendants are exculpated from liability for breaches of the duty of care, "a serious threat of liability may only be found to exist if the plaintiff pleads a *non-exculpated* claim against the directors based on particularized facts."  *Id.* at 124–25 (internal quotation omitted).

Goldman Sachs' certificate of incorporation exculpates the Director Defendants from liability to the Company to the fullest extent allowed by Delaware law.  (Wheeler Decl. ¶ 5 & Ex. D.)  The Court may take judicial notice of this "significant fact." *E.g.*, *Ferre*, 2007 WL 1180650, at *8.  Thus, the Director Defendants cannot be held liable to the Company under Delaware law unless they failed to discharge their oversight responsibilities in good faith or otherwise breached their duties of loyalty.  *See Stone* v. *Ritter*, 911 A.2d 362, 367-70 (Del. 2006); *In re Caremark Int'l Inc. Deriv. Litig.*, 698 A.2d 959 (Del. Ch. 1996).  Accordingly, when a company has adopted an exculpatory provision, the standard for assessing oversight liability is

similar to the standard for assessing a disinterested director's decision under the duty of care because bad faith is a central component to both analyses. *Citigroup*, 96 A.2d at 125.

Bad faith may be established where a director "intentionally acts with a purpose other than that of advancing the best interests of the corporation, ... acts with the intent to violate applicable positive law, or ... intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties." *In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 67 (Del. 2006). "[A] plaintiff must also plead particularized facts that demonstrate that the directors acted with scienter, *i.e.,* that they had 'actual or constructive knowledge' that their conduct was legally improper." *Wood*, 953 A.2d at 141. For the reasons addressed in Part II.A, we find that the Complaint fails to plead particularized factual allegations sufficient to support the conclusion that Defendants acted with bad faith based on their potentially improper evaluation of the risk that threatened the ARS market and the resulting losses suffered by the company and investors. *Id.* at 126; *In re Caremark Int'l Derivative Litig.*, 698 A.2d 959, 967 (Del. Ch. 1996).

Finally, the Court is unconvinced by Plaintiff's arguments concerning director compensation. It is well established that allegations that defendants "are paid for their services as directors" do not excuse demand. *Grobow v. Perot*, 539 A.2d 180, 188 (Del. 1988); *see also Pirelli*, 579 F. Supp. 2d at 535-36; *In re IAC/InterActiveCorp Sec. Litig.*, 478 F. Supp. 2d 574, 602 (S.D.N.Y. 2007). To the contrary, "[w]here a majority of the directors are . . . outside directors receiving no income other than usual directors' fees[,] the presumption of good faith is heightened." *Moran* v. *Household Int'l, Inc.*, 490 A.2d 1059, 1074–75 (Del. Ch.), *aff'd*, 500 A.2d 1346 (Del. 1985). The allegations in the Complaint simply do not overcome this presumption of good faith.

As Plaintiff has failed to make demand upon the Board of Directors of Goldman Sachs Group Inc. and has failed to establish a basis for excusing demand, the instant derivative action is dismissed.

**SO ORDERED.**

Dated: May 19, 2009
New York, NY

_____
U.S.D.J